777 A.2d 348 (2001)
342 N.J. Super. 474
STATE of New Jersey, Plaintiff-Appellant,
v.
Corey MILLER, Defendant-Respondent.
Superior Court of New Jersey, Appellate Division.
Submitted September 26, 2000.
Decided June 27, 2001.
*349 Daniel G. Giaquinto, Mercer County Prosecutor, attorney for appellant (Robert E. Lytle, Assistant Prosecutor, of counsel and on the brief).
Ivelisse Torres, Public Defender, attorney for respondent (Abby P. Schwartz, Assistant Deputy Public Defender, of counsel and on the brief).
Before Judges KESTIN, CIANCIA and ALLEY.
The opinion of the court was delivered by KESTIN, J.A.D.
The issues before us in this appeal arise from the trial court's grant of defendant's motion to suppress evidence that was found in clothing belonging to him and elsewhere within his reach in a third-party's home in a search conducted upon execution of a parole warrant for defendant's arrest, but without a search warrant. The *350 focal question is one of first impression under State law implicating the rights guaranteed by Article I, paragraph seven, of the Constitution of New Jersey to be free from unreasonable searches and seizures, and going beyond issues previously addressed in State v. Jones, 143 N.J. 4, 667 A.2d 1043 (1995), and State v. Bruzzese, 94 N.J. 210, 463 A.2d 320 (1983), cert. denied, 465 U.S. 1030, 104 S.Ct. 1295, 79 L.Ed.2d 695 (1984). It calls upon us to define the nature and extent of knowledge an arresting officer must have regarding a suspect's presence in a third-party's dwelling before executing an arrest warrant therein.
This matter must be resolved on State law grounds because our principles of standing to bring a motion to suppress evidence obtained in an unlawful search and seizure are broader than those which govern the application of the standards developed under the Fourth Amendment to the Constitution of the United States. See State v. Alston, 88 N.J. 211, 218-30, 440 A.2d 1311 (1981). Under State law, the motion may be brought by a defendant against whom evidence is proffered "if he has a proprietary, possessory or participatory interest in either the place searched or the property seized." Id. at 228, 440 A.2d 1311.
[W]hen the charge against defendant includes an allegation of a possessory interest in property seized such as would confer standing, under the traditional test we retain today, to object to prosecutorial use of evidence obtained in an unlawful search and seizure, the defendant has automatic standing to bring a suppression motion under R. 3:5-7, as "a person claiming to be aggrieved by an unlawful search and seizure["] and having reasonable grounds to believe that the evidence attained [sic] may be used against him in a penal proceeding.

[Id. at 228-29, 440 A.2d 1311.]
Under federal constitutional law, defendant, as the subject of an arrest warrant, might well lack the standing to object to the search, without a search warrant, of a home in which he was present but in which he did not reside. See generally Steagald v. United States, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); Rakas v. Illinois, 439 U.S. 128, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978), reh'g denied, 439 U.S. 1122, 99 S.Ct. 1035, 59 L.Ed.2d 83 (1979); see also United States v. McIntosh, 857 F.2d 466, 467 (8th Cir.1988); United States v. Levasseur, 699 F.Supp. 995, 999 (D.Mass.1988), aff'd sub nom. United States v. Curzi, 867 F.2d 36 (1st Cir.1989).
[I]n the appropriate situation our State Constitution may independently furnish a basis for protecting personal rights when it is not clear that the guarantees of the federal Constitution would serve to grant that same level of protection. See State v. Schmid, 84 N.J. 535, 553-60, 423 A.2d 615 (1980). That this basic principle of American federalism confers upon this Court the power to afford the citizens of this State greater protection against unreasonable searches and seizures than may be required by the Supreme Court's interpretation of the Fourth Amendment is beyond question.

[Alston, supra, 88 N.J. at 225, 440 A.2d 1311.]
This authority to apply the State Constitution independently from and more broadly than the federal Constitution has been exercised frequently by the New Jersey Supreme Court in respect of search and seizure issues. See, e.g., State v. Cooke, 163 N.J. 657, 671, 751 A.2d 92 (2000) (retaining the probable cause and exigent circumstances tests in assessing the reasonableness of an automobile search); State v. Pierce, 136 N.J. 184, 209-10, 642 A.2d 947 (1994) (declining to adopt a categorical rule permitting warrantless *351 automobile searches incident to all arrests); State v. Hempele, 120 N.J. 182, 223, 576 A.2d 793 (1990) (holding invalid warrantless searches of garbage bags left on curb for collection); State v. Novembrino, 105 N.J. 95, 158, 519 A.2d 820 (1987) (rejecting a good-faith exception to the exclusionary rule for search warrants issued without probable cause); State v. Hunt, 91 N.J. 338, 348, 450 A.2d 952 (1982) (recognizing a protectible interest in telephone-toll-billing records); State v. Johnson, 68 N.J. 349, 353-54, 346 A.2d 66 (1975) (holding that the validity of a consent to search depends on knowledge of the right to refuse consent). We conclude that the case before us requires the same approach in order to keep faith with principles and policies embodied in our State's Constitution.
As a matter of State law, therefore, we adopt a two-part standard governing the execution of an arrest warrant in circumstances such as those at hand: in the absence of consent or exigency, an arrest warrant is not lawfully executed in a dwelling unless the officers executing the warrant have objectively reasonable bases for believing that the person named in the warrant both resides in the dwelling and is within the dwelling at the time. The trial court here found that defendant was not a resident of the premises in question, that the arresting officers had no adequate basis to believe defendant was a resident of that third-party's home, and that the thirdparty did not consent to the arresting officers' entry into her home. These findings, in view of the absence of a search warrant and the State's concession that no exigent circumstances existed, compel us to affirm the order suppressing the evidence found incident to the arrest.
On August 26, 1998, while defendant was on parole from a State prison sentence, a parole warrant was issued for his arrest. See N.J.S.A. 30:4-123.62. The warrant was executed at 263 Spring Street, Trenton, on February 24, 1999, by defendant's parole officer, Joseph McGovern, and five other officers. After the officers gained entry, defendant was found in the front bedroom of the second-floor apartment in which his two children and their mother, Sandra Champion, resided. When the officers first saw him, defendant was lying facedown on the floor at the bed, dressed only in his underwear. It appeared to McGovern that defendant was attempting to get under the bed but could not fit between the nightstand and the bed. The officers placed defendant under arrest, handcuffing him and seating him on the bed. At the officers' request, defendant selected some attire to wear from clothes scattered on the floor. The officers first searched the items defendant had selected, and found in them marijuana contained in two small bags and in a clear bottle. The officers then searched the area surrounding defendant. In the nightstand beside the bed, they found a large zip-lock bag, forty-eight smaller bags, and four clear bottles, all of which contained marijuana. McGovern testified at the suppression hearing: "On the parole warrant, we were looking for parole violations, any contraband, anything of that sort." The officers did not have a search warrant for the apartment. Based upon the evidence seized, defendant was charged with fourth degree possession of marijuana and third degree possession of the marijuana with intent to distribute.
McGovern and Champion were the only witnesses at the suppression hearing, for the State and the defense respectively. Judge Smithson found both to be credible, an evaluation we have no reason to reject. See State v. Watson, 261 N.J.Super. 169, 177, 618 A.2d 367 (App.Div.1992), certif. denied, 133 N.J. 441, 627 A.2d 1145 (1993) *352 (applying the substantial evidence rule of State v. Johnson, 42 N.J. 146, 160-62, 199 A.2d 809 (1964), to findings made on motions to suppress); State v. Boone, 114 N.J.Super. 521, 525, 277 A.2d 414 (App. Div.), certif. denied sub nom. State v. Terry, 58 N.J. 595, 279 A.2d 680 (1971) (same).
McGovern testified that he had been defendant's supervising parole officer. After securing the arrest warrant, he attempted on three separate occasions between September 30, 1998 and January 21, 1999, to locate defendant at the address listed therein, 52 Sanhican Drive, Trenton. On the first visit, McGovern was told by an occupant of that residence, defendant's aunt, that defendant did not live at that address and that she was uncertain as to where he could be found.
McGovern reviewed defendant's file and discovered notes revealing that defendant spent a great deal of time with Champion, who, according to the notes, resided at 58 Colonial Avenue, Trenton. Therefore, on February 24, 1999, at approximately 7:00 a.m., McGovern and the five other parole officers went to that address to execute the arrest warrant. The officers were told by an occupant of that residence, Champion's mother, that defendant did not reside there, but lived with her daughter and the couple's children in a second floor apartment located at 263 Spring Street, and were there at that time.
The parole officers proceeded immediately to 263 Spring Street, arriving at approximately 7:10 a.m. Champion answered the door to the apartment and, after the parole officers identified themselves and revealed their purpose, she told them defendant was not there. At the suppression hearing, McGovern testified that after he informed Champion he had spoken with her mother and was going to call the Trenton police as back-up if she did not let the contingent into the apartment, Champion stepped aside and allowed the parole officers to enter. According to McGovern in response to a question from the court, the parole officers had planned to enter the apartment whether Champion gave them permission or not.
Champion recounted a version of events different in significant particulars. She testified that the parole officers identified themselves as police and threatened her with arrest if she did not let them into her apartment, as she was harboring defendant. Initially Champion opened the door to let them into the apartment, but when the parole officers refused to show her a warrant, she put her hands up to stop them from proceeding any further into the apartment. Yet, they walked right past her.
Champion also testified about the living arrangements in her second floor apartment, maintaining that only she and her two children resided there. She insisted that defendant lived with his aunt at 52 Sanhican Drive. She indicated that although defendant would stop by the apartment to see their children, he stayed overnight only a few times a month; and that he did not possess keys to the apartment.
In evaluating the evidence and the positions advanced by counsel, Judge Smithson noted the State had argued that Champion's consent was not the focal issue in the matter and that "[t]he evidence support[ed] a finding that the defendant lived at that home. Consequently, consent was not necessary, and the officers had a right to enter the home and search." The judge went on:
The issue is, in my judgment, whether or not the evidence supports a finding that the defendant lived at the home that was searched at the time, meaning, 263 Spring Street, apartment 2 in Trenton *353 on February 24, 1999. The state's argument is based upon a construct that he, the defendant, wasn't found at the residence that he had listed, and that was his last known address, as far as parole authorities are concerned, and I think that's a reasonable statement of fact that has been developed here, and that his aunt indicated that he didn't live there anymore, but lived somewhere else. She didn't testify, so it's a hearsay statement. It's acceptable in terms of a hearing such as this. There's always a question of what weight must be attached to it. The fact that the defendant was found at 263 Spring Street is somewhat corroborative, but certainly, it doesn't end the inquiry at all.
I don't know where the defendant really calls home, it may be any number of places, but I'm satisfied from listening to the testimony of Sandra Champion that he was a visitor, a visitor who may have been there more frequently than she said, but I don't find that the evidence is such that it supports the conclusion that that is or that was his residence at the time. He certainly had children, they lived there, but I haven't heard anything or any evidence that indicated he's going to get some sort of an award for being a good dad or a good father. I tend to think he didn't see[ ] them very frequently.
I do think, from what she said, and she was being truthful, that it was embarrassing testimony. Essentially, the defendant came when he wanted to become intimate. He kind of used her. It may have been very much a one-way street. It doesn't say much about Mr. Miller, but nonetheless, it does, in my judgment, support the fact that he was not a resident of that particular home at the time. And I do accept Ms. Champion's testimony in that regard. I find it to be entirely credible.
The question then becomes did she consent to let the officers in, and I have to answer that no, and I don't think it's a question or issue of whether or not she knew she had the right not to let them in, it ultimately is an issue of voluntariness. Is this something that she voluntarily did? She was faced with six officers and badges and so forth, all right. Even so, she had the presence of mind to talk to them, and they're talking to her, she just didn't back up and open the door. But I do believe that she did that after she got the clear impression that it didn't matter what she said. They were going to come into that apartment and search, and if they needed to get the backup of the Trenton Police, it was either to arrest her for harboring a fugitive, which is a fairly heavy threat under the circumstances that existed at 7:00 that morning, or that they needed more help to simply accomplish what they wanted to do, and what they wanted to do, McGovern indicated, was to go in and get the defendant. There was no issue. I asked a question, and I think he was candid and responsive, he said that they were going to go in no matter what she said, and I think that's absolutely true.
She opened the door in the face of the coercive, in my judgment, situation that exhibited. She said she had a moment where she was going to let them come in, but again, I'm finding it wasn't voluntary, and then she said she had second and third thoughts and wanted some proof that they could really come in and violate her home. Obviously, that didn't mean a whole lot. They were coming in and found the defendant.
I find that the consent, consequently, was not consensual. I do find that the application made by the defendant to suppress evidence for the reasons I've *354 stated is sound, and the Court will suppress the evidence that was seized. That would be in the clothing as well as in the nightstand.
In addition to its credibility determinations, the trial court's findings are binding on appeal because they are supported by substantial, credible evidence. See State v. Locurto, 157 N.J. 463, 470-72, 724 A.2d 234 (1999); Johnson, supra, 42 N.J. at 160-62, 199 A.2d 809; Watson, supra, 261 N.J.Super. at 177, 618 A.2d 367 (applicability of substantial evidence rule on reviews from decisions on motions to suppress); Boone, supra, 114 N.J.Super. at 525, 277 A.2d 414 (same).
The State, on leave granted, appeals from the trial court's grant of defendant's motion to suppress the evidence seized in the search, arguing:
THE TRIAL COURT APPLIED THE WRONG STANDARD OF PROOF UNDER Payton v. New York [, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed. 2d 639 (1980),] AND CONSIDERED ERRONEOUS FACTS IN GRANTING THE DEFENDANT'S MOTION TO SUPPRESS; AS A RESULT OF THESE ERRORS THE TRIAL COURT MISTAKENLY FOUND THAT THE PAROLE OFFICERS, WHO ADMITTEDLY LACKED EXIGENT CIRCUMSTANCES OR A SEARCH WARRANT FOR 263 SPRING STREET, HAD INSUFFICIENT EVIDENCE TO BELIEVE THAT THE DEFENDANT WAS RESIDING AT THAT LOCATION WHEN THEY EXECUTED A WARRANT FOR HIS ARREST THEREIN.
A. The trial court erroneously interpreted Payton to require that law enforcement officers have actual knowledge, as opposed to a reasonable belief, concerning where a suspect resides before they can execute an arrest warrant within a residence, assuming they do not also have a search warrant or exigent circumstances.
B. The trial court improperly considered information which was unknown to the parole officers at the time they entered 263 Spring Street in determining that they lacked sufficient evidence to believe that the defendant was residing at that location and that he would be present at the time of entry.
C. A Correct application of Payton to the relevant facts developed below establishes that the parole officers had a reasonable basis to believe that the defendant was residing at 263 Spring Street and that he would be found inside when they entered apartment # 2.
Because we approach the issues presented as questions of State law, the principles applied in Payton are not controlling except to the extent they bespeak basic standards of Fourth Amendment protection. Also, the facts before us are different from those in Payton. Nevertheless, the contextual elements we are obliged to consider were first explored by the Supreme Court of the United States in Payton and shortly thereafter in Steagald. They were addressed also by the Supreme Court of New Jersey in Jones, supra, 143 N.J. at 12-16, 667 A.2d 1043, and to some extent in Bruzzese, supra, 94 N.J. at 228-29, 463 A.2d 320. Even though we deal with this matter as one of State law, sound reason and the abundant regard we have for the United States Supreme Court require that its reasoning processes receive our respectful attention. But see Michigan v. Long, 463 U.S. 1032, 1041, 103 S.Ct. 3469, 3476, 77 L.Ed.2d 1201, 1214 (1983) ("If a state court chooses merely to rely on *355 federal precedents as it would on the precedents of all other jurisdictions, then it need only make clear by a plain statement in its judgment or opinion that the federal cases are being used only for the purpose of guidance, and do not themselves compel the result that the court has reached.")
In Payton, the United States Supreme Court resolved two New York appeals. The first involved the admissibility of plain-view evidence seized when the police entered a locked apartment, Theodore Payton's residence. They had gone to the address to arrest Payton for murder. They had not obtained either an arrest warrant or a search warrant. Rather, they were acting pursuant to state statutes "authoriz[ing] police officers to enter a private residence without a warrant and with force, if necessary, to make a routine felony arrest." Id., 445 U.S. at 574, 100 S.Ct. at 1374, 63 L.Ed.2d at 643. No one was present in the apartment when the police broke open the door and entered. They seized a .30 caliber shell casing in plain view that was later admitted into evidence at Payton's murder trial. The trial court held the warrantless and forcible entry to have been authorized by statute and denied the motion to suppress the plain-view evidence. Id., 445 U.S. at 577-78, 100 S.Ct. at 1375-76, 63 L.Ed.2d at 645-46.
The second appeal in Payton involved facts and a search similar to the one at issue here, but also, as in Theodore Payton's case, occurring at the defendant's own home. There, the police went to Obie Riddick's house, also without an arrest warrant or a search warrant, to arrest him for two armed robberies.
When his young son opened the door, they could see Riddick sitting in bed covered by a sheet. They entered the house and placed him under arrest. Before permitting him to dress, they opened a chest of drawers two feet from the bed in search of weapons and found narcotics and related paraphernalia. Riddick was subsequently indicted on narcotics charges. At a suppression hearing, the trial judge held that the warrantless entry into his home was authorized by the revised New York statute, ... and that the search of the immediate area was reasonable under Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685[, reh'g denied, 396 U.S. 869, 90 S.Ct. 36, 24 L.Ed.2d 124 (1969)]....
[445 U.S. at 578-79, 100 S.Ct. at 1376, 63 L.Ed.2d at 646 (footnote omitted).]
The trial court rulings in both the Payton and Riddick prosecutions were upheld on appeal in a single four-to-three opinion of the New York Court of Appeals, People v. Payton, 45 N.Y.2d 300, 408 N.Y.S.2d 395, 380 N.E.2d 224 (1978). That court held as constitutional the state statute which permitted a police officer to enter a felony suspect's home to make a warrantless arrest.
The United States Supreme Court saw the issue presented by the two appeals as a "narrow question," Payton, supra, 445 U.S. at 582, 100 S.Ct. at 1378, 63 L.Ed.2d at 648, not involving exigent circumstances, and not raising "any question concerning the authority of the police, without either a search or arrest warrant, to enter a third party's home to arrest a suspect." Id., 445 U.S. at 583, 100 S.Ct. at 1378, 63 L.Ed.2d at 649. Further, the Court noted:
that in neither case is it argued that the police lacked probable cause to believe that the suspect was at home when they entered. Finally, in both cases we are dealing with entries into homes made without the consent of any occupant. In Payton, the police used crowbars to break down the door and in Riddick, although his 3 year old son answered the door, the police entered before Riddick *356 had an opportunity either to object or to consent.
[Ibid.]
Against this backdrop, the Court analyzed the issues bearing upon the Fourth Amendment in its historical context as a remedy for "indiscriminate searches and seizures conducted under the authority of `general warrants[,]' " ibid., and other evils. Id., 445 U.S. at 584-85, 100 S.Ct. at 1379-80, 63 L.Ed.2d at 649-50; see also Henry v. United States, 361 U.S. 98, 100-02, 80 S.Ct. 168, 170-71, 4 L.Ed.2d 134, 137-38 (1959); Novembrino, supra, 105 N.J. at 106, 519 A.2d 820. The Court reemphasized the values behind the "language [that] unequivocally establishes the proposition that `[a]t the very core [of the Fourth Amendment] stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" Payton, supra, 445 U.S. at 589-90, 100 S.Ct. at 1382, 63 L.Ed.2d at 653 (alterations in original) (quoting Silverman v. United States, 365 U.S. 505, 511, 81 S.Ct. 679, 683, 5 L.Ed.2d 734, 739 (1961)). After distinguishing the questions at hand from those bearing upon warrantless arrests in public places, the Court articulated a two-part rule:
[F]or Fourth Amendment purposes, an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within.
[445 U.S. at 603, 100 S.Ct. at 1388, 63 L.Ed.2d at 661.]
The judgments under review were reversed because "no arrest warrant was obtained in either of these cases[.]" Ibid.; Cf. Bruzzese, supra, 94 N.J. 210, 463 A.2d 320 (1983).
A year after Payton, in Steagald, the Supreme Court dealt with an issue unaddressed in Payton, on facts closer to those implicated in this case. The issue as framed by the Court was "whether, under the Fourth Amendment, a law enforcement officer may legally search for the subject of an arrest warrant in the home of a third party without first obtaining a search warrant." Steagald, supra, 451 U.S. at 205, 101 S.Ct. at 1644, 68 L.Ed. 2d at 41. The Court reaffirmed the basic principle of Payton:
The search at issue here took place in the absence of consent or exigent circumstances. Except in such special situations, we have consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant. [citations omitted] Thus, as we recently observed: "In terms that apply equally to seizures of property and to seizures of persons, the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Payton v. New York, supra, [445 U.S.,] at 590, [100 S.Ct. at 1382, 63 L.Ed.2d at 653].
[Steagald, supra, 451 U.S. at 211-12, 101 S.Ct. at 1647, 68 L.Ed.2d at 45.]
In Steagald, a federal drug enforcement agent had received information from a confidential informant concerning the possible whereabouts of Ricky Lyons, a fugitive wanted on federal drug charges. The informant furnished an Atlanta telephone number at which Lyons could be reached for the next twenty-four hours. Another agent obtained the corresponding address from the telephone company. That agent also determined that Lyons was the subject of a six-month-old arrest warrant.
Two days later, a team of officers drove to the indicated address to search for *357 Lyons. They observed the defendant and another man, Hoyt Gaultney, standing outside the house that was to be searched. The officers approached the men with guns drawn, frisked them and demanded identification, determining that neither was Lyons. Some of the agents went to the house. Gaultney's wife answered the door and told the agents she was alone in the house. She was placed under guard while one agent searched the house. Lyons was not found, but the agent saw some apparent cocaine. The agent in charge sent one of his officers to obtain a search warrant, but in the meantime conducted a second search of the house, which produced additional incriminating evidence. During a third search conducted with a search warrant, the agents discovered forty-three pounds of cocaine. The defendant was arrested and charged with violating federal drug laws. After his motion to suppress was denied, the defendant was convicted. A divided Fifth Circuit Court of Appeals affirmed the denial of the suppression motion. Id., 451 U.S. at 206-07, 101 S.Ct. at 1644-45, 68 L.Ed.2d at 41-42.
The Supreme Court reversed. Regarding defendant and the Gaultneys as the residents of the house, the Supreme Court saw the question posed as "a narrow one[,]" id., 451 U.S. at 211, 101 S.Ct. at 1647, 68 L.Ed.2d at 45, "whether an arrest warrantas opposed to a search warrantis adequate to protect the Fourth Amendment interests of persons not named in the warrant, when their homes are searched without their consent and in the absence of exigent circumstances." Id., 451 U.S. at 212, 101 S.Ct. at 1648, 68 L.Ed.2d at 45-46.
In discussing the conceptual background, the Court noted:
[W]hile an arrest warrant and a search warrant both serve to subject the probable-cause determination of the police to judicial review, the interests protected by the two warrants differ. An arrest warrant is issued by a magistrate upon a showing that probable cause exists to believe that the subject of the warrant has committed an offense and thus the warrant primarily serves to protect an individual from an unreasonable seizure. A search warrant, in contrast, is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police.
[Id., 451 U.S. at 212-13, 101 S.Ct. at 1648, 68 L.Ed.2d at 46.]
The Court observed that although the arrest warrant was a valid authorization to seize Lyons, it could not be used by law enforcement personnel "as legal authority to enter the home of a third person based on their belief that Ricky Lyons might be a guest there[,]" because "[r]egardless of how reasonable this belief might have been... the warrant ... [while] protect[ing] Lyons from an unreasonable seizure, ... did absolutely nothing to protect [the defendant]'s privacy interest in being free from an unreasonable invasion and search of his home." Id., 451 U.S. at 213, 101 S.Ct. at 1648, 68 L.Ed.2d at 46.
In the absence of exigent circumstances, we have consistently held that such judicially untested determinations are not reliable enough to justify an entry into a person's home to arrest him without a warrant, or a search of a home for objects in the absence of a search warrant. Payton v. New York, supra,.... We see no reason to depart from this settled course when the search of a home is for a person rather than an object.

*358 [Id., 451 U.S. at 213-14, 101 S.Ct. at 1648, 68 L.Ed.2d at 46.]
The Court went on to state that neither the common law nor Fourth Amendment history provided any justification, in the factual context provided, for entry into a home based alone upon an arrest warrant for someone who did not reside there, id., 451 U.S. at 217-20, 101 S.Ct. at 1650-52, 68 L.Ed.2d at 48-51, absent consent or exigency, id., 451 U.S. at 221-22, 101 S.Ct. at 1652, 68 L.Ed.2d at 51. A search warrant was required. Id., 451 U.S. at 222, 101 S.Ct. at 1653, 68 L.Ed.2d at 52.
We have no reason to perceive that the historical, value-laden underpinnings of Article I, paragraph seven, of the New Jersey Constitution are in any material respect different from those that undergird the Fourth Amendment to the United States Constitution. It is only the breadth of application of the two provisions that has come to differ as the respective Supreme Courts have employed separate and somewhat variant interpretive approaches.
We are confronted here with a factual situation one step removed from Steagald which requires us to determine whether a search of defendant and his effects and surroundings was valid after he was found in a third-party's home into which entry was gained without a search warrant but rather on the basis of an arrest warrant for defendant. Unlike in Steagald, defendant here was not a resident of the home that was entered on the authority of the arrest warrant. With the policy-perspective guidance provided by the United States Supreme Court and the New Jersey Supreme Court regarding the meaning of the constitutional protections against unreasonable searches and seizures, and our State Supreme Court's views on defendant's "automatic standing" to move, on any and all grounds available, to suppress evidence that may be used against him, we conclude that the trial court must be affirmed.
Manifestly, under the reasoning of Steagald, an arrest warrant generally furnishes no authority to the police to intrude on the privacy of a home or to engage in a search therein. See Steagald, supra, 451 U.S. at 212-13, 101 S.Ct. at 1648, 68 L.Ed.2d at 46. In the absence of appropriate exigency, such as hot pursuit into the home, see Jones, supra, 143 N.J. at 19, 667 A.2d 1043 ("Police officers acting pursuant to a valid arrest warrant have the right to follow a fleeing suspect into a private residence."), only one possible exception to this principle is recognized, and that is the aforementioned rule of Payton which holds that "an arrest warrant founded on probable cause implicitly carries with it the limited authority to enter a dwelling in which the suspect lives when there is reason to believe the suspect is within." Payton, supra, 445 U.S. at 603, 100 S.Ct. at 1388, 63 L.Ed.2d at 661. Clearly therefore, the State's argument before the trial court that "the officers had a right to enter the home and search" has no basis in law. The arrest warrant itself conferred no independent right to search. A search was permissible only after lawful entry was gained and then only to the extent it was incident to a valid arrest. See generally Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685, reh'g denied, 396 U.S. 869, 90 S.Ct. 36, 24 L.Ed.2d 124 (1969); State v. Patino, 83 N.J. 1, 414 A.2d 1327 (1980); 3 LaFave on Search and Seizure § 6.3 at 295-312 (3d ed.1996).
The rule of Payton has been relied upon by the New Jersey Supreme Court as applicable to search and seizure issues arising under Article I, paragraph seven, of the State Constitution. See, e.g., Jones, supra, 143 N.J. 4, 667 A.2d 1043; Bruzzese, supra, 94 N.J. 210, 463 A.2d 320.
*359 The question remains, however, as to how the rule is to be understood and applied under the New Jersey Constitution in circumstances such as those presented here, where the dwelling which was entered was not the home of the person named in the arrest warrant.
The words of the Payton rule, on their face, bespeak two different standards, only one of which is measured by the reasonable belief of the officers executing the arrest warrant. Taken literally, the language suggests that valid execution of the arrest warrant in a dwelling is limited to the circumstance in which the dwelling is the actual residence of the suspect. With this understanding it would make no difference whatsoever how things appeared to the officers, i.e., how strong were the indicia that the dwelling was the home of the suspect; if it turned out that it was not his actual residence, the attempt at executing the warrant would be deemed invalid. Clearly, however, by its own terms, the second part of the Payton criterion is tested by the reasonable belief of the officers at the time of entry that the suspect is within. Cf. Bruzzese, 94 N.J. 210, 463 A.2d 320 (1983).
As far as we are able to determine, no court which has applied the Payton standard has regarded the first element to be as absolute as its text suggests. Most courts have held it to be governed by the same reasonable belief test as informs the second element. See, e.g., United States v. Bervaldi, 226 F.3d 1256, 1259, 1263-64 (11th Cir.2000); Valdez v. McPheters, 172 F.3d 1220, 1225 (10th Cir.1999); United States v. Lovelock, 170 F.3d 339, 343 (2d Cir.1999), cert. denied, 528 U.S. 853, 120 S.Ct. 134, 145 L.Ed.2d 114 (1999); United States v. Route, 104 F.3d 59, 62 (5th Cir.), reh'g en banc denied, 111 F.3d 894 (5th Cir.), cert. denied, 521 U.S. 1109, 117 S.Ct. 2491, 138 L.Ed.2d 998 (1997); United States v. Risse, 83 F.3d 212, 216 (8th Cir. 1996); United States v. Lauter, 57 F.3d 212, 215 (2d Cir.1995); United States v. Magluta, 44 F.3d 1530, 1535 (11th Cir.), cert. denied, 516 U.S. 869, 116 S.Ct. 189, 133 L.Ed.2d 126 (1995); Morgan v. State, 963 S.W.2d 201, 204 (Texas App.-Hous. 1998). See generally 3 LaFave, supra, § 6.1(a) at 223-32.
A few courts seem to have posited the need for a higher standard of knowledge probable causein this connection, see United States v. Harper, 928 F.2d 894, 896 (9th Cir.1991) aff'd, 48 F.3d 1229 (9th Cir. 1995); United States v. Watts, 67 F.3d 790, 795 (9th Cir.1995), reh'g denied, 79 F.3d 768 (9th Cir.1996), cert. denied, 517 U.S. 1128, 116 S.Ct. 1369, 134 L.Ed.2d 534, cert. granted and rev'd on other grounds, 519 U.S. 148, 117 S.Ct. 633, 136 L.Ed.2d 554, reh'g denied, 519 U.S. 1144, 117 S.Ct. 1024, 136 L.Ed.2d 900 (1997); State v. Kiper, 193 Wis.2d 69, 532 N.W.2d 698, 704 (1995), but it is not certain that that is the prevailing standard in those jurisdictions. Compare United States v. Albrektsen, 151 F.3d 951, 954 (9th Cir.1998); State v. Blanco, 237 Wis.2d 395, 614 N.W.2d 512, 516, 518 (Ct. App.), review denied, 239 Wis.2d 308, 619 N.W.2d 92 ( Ct. App. 2000), and review denied sub nom. State v. Al-Shammari, 239 Wis.2d 308, 619 N.W.2d 92 (2000).
In resolving this question, we have ambiguous guidance from the New Jersey Supreme Court. In Jones, the court provided an interpretive gloss on the Payton rule:
[T]he police have the right to execute an arrest warrant on a defendant at his or her home, and they may enter the home to search for the defendant when there is probable cause to believe that he or she is there.
[Jones, supra, 143 N.J. at 13, 667 A.2d 1043 (emphasis supplied).]
But, the court went on to hold:
The valid arrest warrant provided a "limited authority to enter a dwelling" in *360 which [the person named in the arrest warrant] lived when there was reasonable grounds to believe he was there.
[Id. at 15, 667 A.2d 1043 (emphasis supplied) (quoting Payton, supra, 445 U.S. at 603, 100 S.Ct. at 1388, 63 L.Ed.2d at 661).]
And further:
As long as the officers acted reasonably in executing the warrant, as they did..., then the arrest and any evidence seized incident to the arrest should be admitted.
[Id. at 17, 667 A.2d 1043 (emphasis supplied).]
In Jones, defendant was with a companion, Lonzie Collier, when spotted by two police officers on surveillance regarding a matter unrelated to defendant. One of the police officers knew of an outstanding warrant for Collier's arrest, but was unaware of the reason the warrant had been issued: Collier's failure to pay fines assessed for prior convictions. Id. at 8, 667 A.2d 1043. Defendant and Collier recognized the police officers and fled as they approached. The officers pursued the fleeing men to the third floor of a nearby building, where defendant and Collier entered an apartment. The officers tried the door, found it locked, and kicked it in. One of them testified that he immediately observed a table upon which were strewn narcotics paraphernalia and documents relating to the owner of an automobile which, a few days earlier, had been broken into and some of its contents stolen. A crowbar wrapped in a newspaper was also found on the floor. Defendant and Collier were arrested. Ultimately, defendant gave a statement to the police acknowledging his participation with Collier in the earlier incident and furnishing details. After the trial court denied defendant's motion to suppress the evidence obtained at the apartment as well as his oral statement, and granted his motion to sever other counts of first degree robbery, possession of heroin and receiving stolen property, he was convicted of burglary.
Viewing the apartment as Collier's residence, the Supreme Court held that "[t]he valid arrest warrant provided a `limited authority to enter a dwelling' in which Collier lived when there was reasonable grounds to believe he was there." Id. at 15, 667 A.2d 1043 (quoting Payton, supra, 445 U.S. at 603, 100 S.Ct. at 1388, 63 L.Ed.2d at 661). It held further that "[p]olice officers acting pursuant to a valid arrest warrant have the right to follow a fleeing suspect into a private residence[,]" id. at 19; see also Steagald, supra, 451 U.S. at 217-18, 101 S.Ct. at 1650-51, 68 L.Ed.2d at 48-49 (noting this to be the common law rule), and went on to state:
In other circumstances a forcible entry to execute an arrest warrant may not be reasonable.... For example, if the police are executing a warrant at a suspect's home, rather than on a fleeing suspect that they by chance happen to see on the street, we expect that the police will present the warrant at a proper hour and will knock and announce their presence at the suspect's door. The main test always remains whether the law enforcement officer has acted in an objectively reasonable manner.
[Jones, supra, 143 N.J. at 19-20, 667 A.2d 1043 (footnote omitted).]
As the United States Supreme Court has instructed, both at the common law and under more modern search and seizure jurisprudence, the authority of police officers to enter a home based upon an arrest warrant for someone who does not reside there is limited to special circumstances. See Steagald, supra, 451 U.S. at 217-20, 101 S.Ct. at 1650-52, 68 L.Ed.2d at 48-51.

*361 [T]he history of the Fourth Amendment strongly suggests that its Framers would not have sanctioned the instant search. The Fourth Amendment was intended partly to protect against the abuses of the general warrants that had occurred in England and of the writs of assistance used in the Colonies. See Payton, supra, 445 U.S. at 608-09, 100 S.Ct. 1371, 63 L.Ed.2d 639 (White, J., dissenting); Boyd v. United States, 116 U.S. 616, 624-29, 6 S.Ct. 524, 29 L.Ed. 746 (1886); N. Lasson, The History and Development of the Fourth Amendment to the United States Constitution 13-78 (1937). The general warrant specified only an offensetypically seditious libeland left to the discretion of the executing officials the decision as to which persons should be arrested and which places should be searched. Similarly, the writs of assistance used in the Colonies noted only the object of the searchany uncustomed goodsand thus left customs officials completely free to search any place where they believed such goods might be. The central objectionable feature of both warrants was that they provided no judicial check on the determination of the executing officials that the evidence available justified an intrusion into any particular home. Stanford v. Texas, 379 U.S. 476, 481-85, 85 S.Ct. 506, 13 L.Ed.2d 431 [, reh'g denied, 380 U.S. 926, 85 S.Ct. 879, 13 L.Ed.2d 813] (1965). An arrest warrant, to the extent that it is invoked as authority to enter the homes of third parties, suffers from the same infirmity... Like a writ of assistance, it specifies only the object of a searchin this case, Ricky Lyonsand leaves to the unfettered discretion of the police the decision as to which particular homes should be searched. We do not believe that the Framers of the Fourth Amendment would have condoned such a result.
[Id., 451 U.S. at 220, 101 S.Ct. at 1651-52, 68 L.Ed.2d at 50-51 (footnote omitted).]
Clearly then, to the extent a hierarchy of search and seizure values exists, the interests in privacy and integrity of person and property which those values are designed to protect are greater for the resident of a dwelling who is not the object of an arrest warrant than they are for the person who is named in the warrant. The former command the highest regard and, except for special circumstances, are inviolable in the absence of a search warrant. Forcible entry to execute an arrest warrant is generally intolerable under traditional standards governing searches and seizures in this State. It follows that the use of an arrest warrant to gain any entry into a third party's home, but that which is freely consented to, is also forbidden unless the necessary special circumstances exist. With the trial court's findings herein that no consent had been given, and with no assertion of any special circumstances, it is clear that the officers executing the arrest warrant in this case lacked a sufficient basis for doing so, i.e., that could be deemed to outweigh the interests of the innocent occupants of the home. Except as it may satisfy the requirements of the Payton rule, an arrest warrant may not be used as a pretext for gaining entry to conduct a search of a third-party's home; and, even if entry is properly gained, the arrest warrant may be used to support a subsequent search only when that search is conducted incident to an arrest lawfully made. The underlying reason for this rule is obvious: the standard for issuing an arrest warrant, and its focal purpose, do not confer the minimum protections which the probable cause standard and special purposes for search warrants provide. See *362 Steagald, supra, 451 U.S. at 212-13, 101 S.Ct. at 1648, 68 L.Ed.2d at 46.
Yet, we cannot disregard the fact that the parole arrest warrant in this matter was lawfully issued pursuant to statutory authority, N.J.S.A. 30:4-123.62. It may not be dealt with as a nullity. The question is the standard by which the validity of its use is to be assessed. For this purpose at this time, we see no good reason for positing a different standard for parole arrest warrants than for arrest warrants generally.
We reach this conclusion with the understanding that the arrest warrant in this matter, issued by the Parole Board pursuant to authority conferred by N.J.S.A. 30:4-123.62, was lacking the protective involvement of a detached magistrate. That is the safeguard assumed to exist by the United States Supreme Court in the rationale it employed in Steagald, supra, 451 U.S. at 212-13, 101 S.Ct. at 1648, 68 L.Ed.2d at 46, with respect to arrest warrants generally. It follows that the even higher safeguards attending the probable cause standard for the issuance of a search warrant by a detached magistrate were not applied, either. Ibid. Nevertheless, as Judge Smithson found, that parole arrest warrant was used as a basis for gaining entry and searching the third party's premises for defendant. It was also used as a pretext for a general search once on the premises, as revealed by Officer McGovern's testimony to the trial court that "[o]n the parole warrant, we were looking for parole violations, any contraband, anything of that sort[,]" and the State's argument that "the officers had a right to enter the home and search."
There is an underlying logic that would support applying a more demanding standard of inquiry to parole arrest warrants than to arrest warrants generally. If arrest warrants issued by detached magistrates do not confer the same level of protection as search warrants do, especially with regard to the rights and interests of innocent third-party residents of a dwelling, then arrest warrants issued by the Parole Board manifestly provide even less protection for those rights and interests. Even if it were possible to view a typical arrest warrant as carrying with it an independent authority to searcha result negated by the rationale of Steagald, there is no parallel justification that could be used to validate a search conducted under the authority of a parole arrest warrant.
We nevertheless decline to apply a special standard governing the execution of parole arrest warrants in circumstances such as those presented here. No facts developed in this case and no arguments advanced suggest such an approach, and we should not adopt a rule in a vacuum. See Hoppe v. Ranzini, 158 N.J.Super. 158, 170, 385 A.2d 913 (App.Div.1978); Markert v. Byrne, 154 N.J.Super. 410, 414, 381 A.2d 806 (App.Div.1977). Should it become apparent in the future that special features of parole arrest warrants or the ways in which they are executed require special rules because they present special threats to the privacy, property, and personal integrity interests protected by Article I, paragraph seven, of the State Constitution, such particularized approaches can be developed.
In articulating the general rule, the weight of authority persuades us that a probable cause standard for the first element of the Payton/Steagald rule, even to protect the interests of the third-party residents of the home to be entered, would be too demanding. In the absence of a more compelling showing that particular evils exist which need to be remedied, we hesitate to adopt a standard that might unreasonably impede police officers in the discharge *363 of their duties. Yet, because "probable cause is the constitutionally-imposed standard for determining whether a search and seizure is lawful[,]" Novembrino, supra, 105 N.J. at 105, 519 A.2d 820, and because the circumstances with which we are confronted involve entry into a home followed by a search and seizure, even if the entry itself is only seen as being for the purpose of conducting a search for the person named in the arrest warrant, something more than the belief of the officers must govern.
Accordingly, we hold that the standard for determining the validity of police action such as occurred here is whether there was an objectively reasonable basis both for believing the residence to have been the home of the person named in the arrest warrant and that he was present in the home at the time the warrant was executed. The only information the officers in this matter had was the statement of Champion's mother that defendant and Champion were living together at 263 Spring Street. That statement was unsupported by observation, investigation or other inquiry. Consequently, as a basis for the officers' action, it did not meet the "objectively reasonable belief" standard in respect of either prong of the pertinent test. See, e.g., Bervaldi, supra, 226 F.3d at 1259, 1263 (holding that the police officers had a reasonable belief that 3621 S.W. 129th Avenue was the suspect's home despite Autotrac reports and driver's license records indicating the suspect's address was 4406 S.W. 132nd Place, based on the police officers' prior observation of the suspect at the 129th Avenue residence, the suspect's prior admission to the police officers that although he resided at 129th Avenue he used his parents' address on his license, and the court's impression that young persons sometimes use their parents' address as a permanent address, but actually reside elsewhere); Valdez, supra, 172 F.3d at 1227-28 (holding that the arresting officers could have reasonably concluded the suspect lived in the residence with his mother based upon the arresting officers' knowledge from a variety of sources that the suspect had been living with his mother, including the suspect's own statements in the presence of an officer, and "[t]he fact that the suspect was otherwise known to be young, unemployed, and `transient' suggests, if anything, that he was still living with his family"); Lovelock, supra, 170 F.3d at 344 (holding that the "totality of the information possessed by the officers gave them no reason to doubt that Williams[, who allegedly violated his probation,] was then a resident of the attic apartment" based upon comments by two tenants that he was presently a resident and "the facts that [the attic apartment] was shown on the arrest warrant as Williams's residence address; that address was more current than the address at which he had lived at the time of his arrest; that probationers are required to report to their probation officers any change of residence; that probation warrants, of which this was one, commonly showed current addresses when issued; and that the warrant for Williams had been issued only one day before"); Route, supra, 104 F. 3d at 62, 63 (concluding that the detective "had done sufficient due diligence to form a reasonable belief [of the suspect]'s residence" based upon the detective's confirmation via the subject's "credit card applications, water and electricity bills, car registration, and receipt of mail that [the subject] at least was representing to others that he was residing" there); Risse, supra, 83 F.3d at 216-17 (determining that the police officers had a reasonable belief that the suspect resided at her boyfriend's home based on her statement to police officers that she was staying with him and that they could contact *364 her there, information obtained from a confidential informant that the suspect was living with her boyfriend, and two successful attempts by police officers to contact her at the boyfriend's home); Magluta, supra, 44 F.3d at 1532-33, 1535 (holding that the evidence supported the marshals' reasonable belief that 98 East La Gorce was defendant's residence where the marshals received a tip from a previously reliable confidential source and made their own observations); Anderson v. United States, 107 F.Supp.2d 191, 196 (E.D.N.Y.2000) (holding that the FBI had reason to believe that the suspect lived at 51 Bayberry Lane based on the facts that he listed it as his residence at one time, the phone service at the house was in his name, his van was registered to and parked regularly at the house, and he was observed by the FBI at the premises "acting in a manner that suggested he resided there"); Russell v. Kitsap County Sheriff's Dep't, 100 Wash.App. 1028, 2000 WL 380543, review denied, 11 P.3d 824 (Wash. 2000) (holding that the deputies had a reasonable belief that the suspect was a resident of defendant's home based upon information listed in the National Crime Information Center computer, information relayed by a county employee and a statement made by defendant to a deputy that the suspect was staying there); Blanco, supra, 614 N.W.2d at 518-19 (holding that the police officers had a reasonable belief that defendant was staying at the co-defendant's apartment where they received "(1) a tip that [defendant] was `staying' at the apartment building; (2) confirmation from the building manager that [defendant] may be staying in the [co-defendant's] apartment; (3) representation from an occupant of the building that [defendant] had just been outside the apartment smoking a cigarette; (4) representation from an occupant of the building that [defendant] returned to the [co-defendant's] apartment after smoking his cigarette; and (5) evidence that [defendant] was not at the [address on the arrest warrant] or any other location investigated earlier that day by police" and where "the police observed individuals inside the ... apartment moving furniture and other objects around the apartment, heard a great deal of noise coming from the bathroom, saw [defendant] attempt to escape the apartment through the window, observed [defendant] inside the apartment through the door jamb, and observed a known friend of [defendant]'s approach the apartment").
The officers in this matter did nothing to confirm independently the snippet of opinion they had received from Champion's mother. Moreover, nothing was offered at the suppression hearing to suggest the officers had anticipated defendant's departure from the premises while they verified the information they had received or tested its sufficiency by applying for a search warrant. See Novembrino, supra, 105 N.J. at 105-29, 519 A.2d 820. Nor did the officers offer any basis for a reasonable belief, beyond the early hour, that defendant was present within. Without the necessary objectively reasonable bases, it is clear that these officers were using this arrest warrant as a surrogate for a search warrant. That was impermissible. See Steagald, supra, 451 U.S. at 213-14, 101 S.Ct. at 1648, 68 L.Ed.2d at 46.
The traditionally held need to protect residential property from undue invasion, along with proper consideration for the residents' privacy and personal integrity interests, required a sounder basis before the officers could enter the home unbidden. With the entry invalid, what proceeded thereafter was tainted and the trial court judge was correct to suppress the evidence seized as a result of the unlawful entry. See Costello v. United States, 365 *365 U.S. 265, 280, 81 S.Ct. 534, 542, 5 L.Ed.2d 551, 561 (1961); State v. Smith, 155 N.J. 83, 102, 713 A.2d 1033, cert. denied, 525 U.S. 1033, 119 S.Ct. 576, 142 L.Ed.2d 480 (1998).
Affirmed.