782 A.2d 440 (2001)
344 N.J. Super. 388
STATE of New Jersey, Plaintiff-Respondent,
v.
Margaret MARCZAK, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Submitted September 24, 2001.
Decided October 17, 2001.
*441 Peter A. Garcia, Acting Public Defender, for appellant (Lon Taylor, Assistant Deputy Public Defender, of counsel and on the brief).
John J. Farmer, Jr., Attorney General, for respondent (Debra A. Owens, Deputy Attorney General, of counsel and on the brief).
Before Judges KESTIN, STEINBERG and ALLEY.
The opinion of the court was delivered by KESTIN, J.A.D.
Defendant was charged with and convicted of a single count of second degree theft. The trial court denied her motion to be sentenced, pursuant to N.J.S.A. 2C:44-1f(2), as for a third degree crime, and imposed a six-year term of imprisonment.[1] The trial court found defendant lacked the ability to make restitution and, citing N.J.S.A. 2C:46-1, it ordered the docketing of a $75,000 judgment against defendant, *442 without prejudice to the victim's rights in a civil action.
On appeal, defendant raises the following issues:
POINT I THE ERRONEOUS REFUSAL TO PROVIDE A HEARING REGARDING THE ACCURACY OF STATE PREPARED TRANSCRIPTS OF INCULPATORY TELEPHONE CONVERSATIONS COMPELLED DEFENDANT NOT TO TESTIFY, MANDATING THE REVERSAL OF DEFENDANT'S CONVICTION AND A NEW TRIAL.
POINT II SINCE THERE WAS AN INSUFFICIENT SHOWING THAT DEFENDANT'S TAPED CONFESSION WAS EITHER ACCURATE OR VOLUNTARY, THE TAPED CONFESSION SHOULD HAVE BEEN EXCLUDED, MANDATING THE REVERSAL OF HER CONVICTION.
POINT III DEFENDANT'S MOTION FOR A NEW TRIAL BASED UPON THE TRIAL COURT'S FAILURE TO INSTRUCT THE JURY THAT THE STATE HAD TO PROVE THE EXISTENCE OF THE $204,000A MATERIAL ELEMENT OF THE THEFT OFFENSE AND A CRITICAL TRIAL ISSUESHOULD HAVE BEEN GRANTED.
POINT IV THE DENIAL OF DEFENDANT'S REQUEST TO BE SENTENCED TO A NON-CUSTODIAL TERM OR AS A THIRD DEGREE OFFENDER WAS AN ABUSE OF DISCRETION, ESPECIALLY IN LIGHT OF THE FACT THAT THIS NON-VIOLENT INCIDENT REPRESENTED THE 55-YEAR-OLD DEFENDANT'S FIRST AND ONLY ARREST AND CONVICTION.
Our review of the record in the light of the arguments advanced by the parties discloses that, with a single exception, these issues are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). The one contention of merit is defendant's Point II that she was entitled to a hearing as to whether statements elicited from her by the victim were voluntary. We remand for such a hearing and for vacation of the judgment of conviction and a new trial if it is determined that prevailing legal standards of voluntariness were not met in respect of those statements.
Defendant was accused of stealing $204,000 from the victim, Anthony Magdon. Defendant and Magdon, both in their fifties, had known each other for many years, since they were teenagers. They had dated briefly in 1965. Beginning in 1991, their relationship became intimate and they began living together in a building which also housed Magdon's business. Magdon confided to defendant the combination to a concealed and alarm-equipped safe located in his office. Magdon testified that he had opened the safe only four times between September 1994 and February 6, 1997, when he discovered that his life's savings were missing. The money had been kept in a briefcase in the safe, and Magdon had had no reason to open the briefcase in the interim.
Magdon was the State's primary witness. Evidence supporting the charge was also presented through Magdon's sister, his niece, and an investigator from the Middlesex County Prosecutor's Office. Defendant did not testify. Her case was presented through the testimony of four relatives and a legal secretary in a law firm that had represented her in two matters.
Magdon's was the only direct testimony as to what had transpired between him *443 and defendant. According to him, he and defendant had been experiencing relational difficulties during the six months preceding February 6, 1997. When he discovered the money was missing, he asked defendant about it in a telephone call. She replied, "It's in a safe place." Upon defendant's return home, Magdon questioned her further about her reasons for taking the money. He testified that her response was: "For the power." Defendant said the money was in a safe deposit box in the Fleet Bank on Route 9 in Manalapan, and that she would take Magdon there the following day to get it since it was already too late to go that day.
The next morning, Friday, February 7, 1997, Magdon and defendant went to the Fleet Bank in Manalapan in separate vehicles. Defendant insisted on entering the bank by herself and emerged with a blue gym bag. She gave the bag to Magdon and told him, "Here's your money." Defendant then left to visit her mother. After returning to his office, Magdon opened the safe and the gym bag. He discovered that the contents of the bag were not the same as they had been. The money was wrapped differently. When he opened two envelopes he saw that they were filled with one dollar bills. The total amount was far less than $204,000; it was subsequently determined to be approximately $1,500.
Magdon tried to reach defendant at her mother's house, but she had already left. He talked to her that evening, demanding to know where his money was and why she had done this to him. She told him that she was just fooling him, that the money was in a safe deposit box at a Fleet Bank branch in New Brunswick, and that she would take him there on Monday.
According to Magdon, on Sunday, February 9, 1997, he asked defendant how he would ever get his money back if anything happened to her. He testified that defendant proceeded to make a tape recorded statement on her small black recording machine, in which she said she had taken Magdon's $204,000 and had placed it in a safe deposit box in a Fleet Bank in New Brunswick. Defendant made the recording while in Magdon's shop and, after playing it several times for Magdon, she left it on the counter. Defendant also wrote out and signed a statement dated February 9, 1997, on a B & T Roofing estimate sheet:
I Margaret R Marczak has a Safe Deposit Box at fleet's Bank, in New Brunwick, and I have onother at fleets Bank on Rt 9 South, I had unlawfully Taken Anthony Magdon's money out of his Safe and I put it in New Brunswick Safe Deposit Box, amount of $204,000
feb 9, 1997 [sic]
On February 10, 1997, Magdon and defendant went to the Fleet Bank in New Brunswick in Magdon's truck, arriving before nine a.m. When the bank opened, defendant told Magdon that they should go inside to get the money. Magdon opened the driver's side door and, as he stepped out, defendant, still inside the cabin, pushed him out with her feet, locked the door so that he could not get back in, and "took off like crazy." Magdon went to the nearby office of his attorney and obtained money to take the bus home.
When Magdon arrived, he found the truck from which he had been ejected parked in front of the building. There was a message from defendant's brother on Magdon's answering machine stating that the truck was parked in front of his business, that the keys were underneath the front tire, and that if Magdon wanted to see his money he should "look where [he] never looked before." Magdon did not know what the last part of the message meant, and he assumed defendant was making a joke out of the whole situation, that she was "testing" him.
*444 Defendant returned either the next day or a few days later with a savings account deposit slip from a bank in Manalapan indicating that $204,000 was in the account. She told Magdon that the money had already earned over a thousand dollars in interest. Magdon told her that he wanted her to go to the bank and have his name put on the savings account, but she replied that the bank would not permit that. The deposit slip was purportedly signed by a bank teller, and it appeared legitimate enough to Magdon to satisfy him that the money was safe. Magdon alleged further that in several subsequent conversations concerning the money defendant assured him that she had it in a safe place and would bring it back to him. Defendant also told Magdon that she could not deal with the money situation because she was going through a difficult time as a result of six recent deaths in her family and her mother's illness. Magdon felt sorry for her.
Magdon testified further that, in March 1997, defendant gave him a black briefcase which she claimed contained $50,000. When Magdon asked her if she wanted to count it out she became agitated, accused Magdon of not trusting her, and insisted that he was getting it "all back," "all brand new money." Defendant had opened the briefcase and Magdon saw that "[i]t was filled to the top with money." He did not count the money or look it over. It was arranged differently than when he had organized it, bundled in yellow-gold wrappers stacked high. He opened the safe and defendant put the briefcase with the money inside. Magdon testified: "[W]e had an agreement. You bring the money back, everything will be forgotten about and it will be the same as it was." Magdon did not open the safe to verify how much was in the briefcase after defendant placed it inside.
Defendant periodically gave Magdon more money in small amounts. When she worked in the Manalapan area he met her in the parking lot of the Fleet Bank on different occasions, and she gave him "little pocketbooks" containing $1100, $1600, $1800, and $5500. Magdon claims that after he had accumulated $100,000 from defendant she telephoned him and asked if he had spent any of the money yet. He told her that he had not because he was waiting until all of it was returned, at which point they would count it together. She told him that the money was "no good." Magdon inspected the money and saw that all of the serial numbers were the same. He then burned the "counterfeit" money in his stove. He did not want defendant to get in trouble, and he suspected that she was "losing it or something.... [t]o do something like that." Magdon had photographed the counterfeit money before he burned it, and the photos were admitted as evidence in the trial.
Finally, on March 13, 1998, Magdon went to the police and signed a complaint against defendant charging her with the theft of his money. Defendant tried giving him money again on the Saturday after he signed the complaint. She met him on the street and gave him a single envelope which she claimed contained $20,000. Magdon determined that money was also counterfeit and threw it back at her. He walked away from her and headed home. She followed him in her car, honking her car horn and "carrying on," telling him that she had his $204,000. As Magdon walked up to his property the defendant threw a clear cellophane bag containing the $20,000 over the fence to him. He threw it back to her, and she threw it back to him. This exchange recurred several times until Magdon went inside his residence and defendant departed. She called him on the telephone screaming that she had the rest of his money in the trunk of *445 her car but that he was not going to get it now. Magdon turned the $20,000 in counterfeit bills over to the police.
We will comment briefly on the contention in Point I of defendant's brief on appeal notwithstanding our determination that the issue is meritless. After listening to certain telephone answering machine tape recordings at issue during a Driver[2] hearing, the trial judge determined they could not be received as affirmative evidence because they did not satisfy the fourth of Driver's five requirements, that "no changes, additions or deletions have been made[.]" Driver, supra, 38 N.J. at 287, 183 A.2d 655. The judge also ruled, however, that the tapes could be used to impeach defendant's testimony if she chose to testify contrary to their content. These rulings were reiterated subsequently, after the State had redacted the tapes to exclude business calls, leaving only a number of answering machine messages from defendant in purported attempts to return Magdon's money.
We are not persuaded that the trial judge's rulings in these respects were erroneous, or that the impact of those rulings on defendant's choice whether or not to testify impinged unduly on any guaranteed right. When considered in the light of Magdon's detailed testimony, the tapes were cumulative; they could reasonably have had no greater impact on defendant's testimonial election than Magdon's testimony did. See State v. Burris, 298 N.J.Super. 505, 514-15, 689 A.2d 860 (App.Div.), certif. denied, 152 N.J. 187, 704 A.2d 17 (1997) ("That a defendant faces... a dilemma demanding a choice between complete silence and presenting a defense has never been thought an invasion of the privilege against self-incrimination.") There were no special qualities in the choice presented to this defendant, who had no criminal record, either to testifywith the risk that the substance of the conversations would be brought out before the jury through her testimony or through impeachmentor to remain silent and forego presenting her version of the events.
The single point raised by defendant of sufficient merit to warrant extended discussion bears upon the receipt in evidence of her tape-recorded "confession" made in Magdon's presence on February 9, 1997. Our focus is not upon any argument directed to the medium of the statement, i.e., the first four Driver criteria, for we regard the court's ruling in that regard to have been correct and based on adequate evidence. Rather, our concern extends to the fifth Driver standard, the voluntariness issue. Thus, we view the handwritten statement prepared by defendant at the same time, also received in evidence, to be subject to the same considerations.
In respect of the question of voluntariness, the trial judge ruled:
I don't think we need a hearing on the voluntariness of the confession. It's entirely a credibility issue that's going to be decided by a jury in this case. I am in no better position to decide credibility than a jury. This is not a bench trial and there is no State involvement. * * * I mean in this case there were two people there.... [S]o that's an issue for the jury and if we get that far I'll charge the jury as to statements made by the defendant. They'll determine whether, in fact, those statements were actually made and if made whether they were credible.
In the face of defendant's expressed contention that Magdon had coerced her taped and written confessions by putting a knife to her throat and then putting a gun *446 to her head, this ruling was error. While there may have been enough before the court for the Driver authentication determination to be made without defendant's own testimony, the voluntariness issue could not be decided without defendant's testimony. To leave determination of the issue solely to the jury was a cession of the trial court's gatekeeping responsibility. Moreover, the ruling exacted too high a cost in respect of defendant's right not to testify before the jury in sacrificing her right to be heard on the voluntariness issue alone.
Under State v. Kelly, 61 N.J. 283, 294 A.2d 41 (1972), defendant was entitled to a voluntariness determination by the court regardless of the fact that the inculpatory statements at issue were elicited from her by a private individual, the victim, rather than a governmental officer. In Kelly, the Supreme Court held
particularly in view of [the defendant's] assertion that [the victim] had obtained the confessing statements through force and the threats of force he was clearly entitled to [a voluntariness] hearing; in this connection the fact that [the victim] was not a police officer would have no significance.
[Id. at 291, 294 A.2d 41.]
Justice Jacobs, writing for the Court, furnished a rationale for the result reached based on a review of the common law through cases from New Jersey and other jurisdictions, including English precedents. The explication began with an analysis of Roesal v. State, 62 N.J.L. 216, 41 A. 408 (E. & A. 1898), in which the court had relied upon English precedents to view confessions
coerced through violence, threat or promise ... "whether made upon an official examination or in discourse with private persons" ... not [to be] admissible in evidence.... [T]he State's acknowledged responsibility was to show, on preliminary examination before the trial judge, that the confession was voluntary in nature.
[Kelly, supra, 61 N.J. at 291-92, 294 A.2d 41 (citations omitted).]
The Court in Kelly went on:
The later New Jersey cases recognized that the coerced confession was to be excluded, not only because of its probable unreliability but also because its admission would offend the community's sense of decency and fairness; and they repeatedly reaffirmed the trial court's responsibility to make a preliminary determination on the issue of voluntariness. The federal decisions have of course subsumed the foregoing within their current constitutional doctrines that a confession which is "involuntary" under modern concepts, namely, the product of physical or psychological coercion, is inadmissible in evidence regardless of its truth or falsity and that a determination of voluntariness must be made independently by the trial judge before the confession may be submitted to the jury.
* * *
[T]he common law precedents excluded confessions coerced through force or threat of force because of their probable unreliability and, on that score, it could hardly matter that the force or threat was by a private person in physical control rather than by a police officer.
[Id. at 292-93, 294 A.2d 41 (citations omitted).]
The State argues that a more recent holding by the Supreme Court of the United States in Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986), abrogates the rule of Kelly. It is clear, however, that in Connelly the United States Supreme Court articulated a federal *447 constitutional standard and that the rule of Kelly is one of State law based upon the common law. Thus, given the independent state law ground at its basis, see State v. Alston, 88 N.J. 211, 225, 440 A.2d 1311 (1981); State v. Miller, 342 N.J.Super. 474, 478-79, 777 A.2d 348 (App.Div.2001), we and the trial courts continue to be bound by Kelly until the Supreme Court of New Jersey posits a different requirement.[3] We hold, accordingly, that defendant was entitled to a voluntariness hearing before the credibility issues were referred to the jury.
As the Court in Kelly concluded, however,
the interests of justice will best be served by now having the trial judge conduct the hearing on voluntariness. If at the hearing the State fails to establish voluntariness beyond reasonable doubt, the defendant will be entitled to a new trial at which the statements will be excluded. If, however, the State does establish beyond reasonable doubt that the statements were voluntary, and the trial judge so determines, then the defendant's conviction may stand. Such procedure ... [has been] expressly recognized as constitutionally permissible[.]
[Kelly, supra, 61 N.J. at 294-95, 294 A.2d 41 (citations omitted).]
The matter is remanded for a voluntariness hearing. If the State fails to establish beyond a reasonable doubt that the statements in issue were voluntary, the conviction shall be vacated and a new trial held in which the statements shall be excluded. If the trial court on remand should determine that the statements were voluntary, the conviction and sentence are affirmed.
NOTES
[1] Defendant has since been released from prison pursuant to the Intensive Supervision Program. See R. 3:21-10(b)(5).
[2] State v. Driver, 38 N.J. 255, 287-88, 183 A.2d 655 (1962).
[3] We reject the State's contention that State v. Smith, 307 N.J.Super. 1, 14-15, 704 A.2d 73 (App.Div.1997), certif. denied, 153 N.J. 216, 708 A.2d 67 (1998), stands for a view contrary to the expressed holding of Kelly.