# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1686-18

STATE OF NEW JERSEY
IN THE INTEREST OF J.A.W., JR.,
a juvenile.

_____

Argued January 10, 2022 – Decided March 17, 2022

Before Judges Sabatino and Rothstadt.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Essex County, Docket Nos. FJ-07-0920-17 and FJ-07-0962-17.

Brian P. Keenan, Assistant Deputy Public Defender, argued the cause for appellant J.A.W., Jr. (Joseph E. Krakora, Public Defender, attorney; Brian P. Keenan, of counsel and on the briefs).

Hannah Faye Kurt, Special Deputy Attorney General/Acting Assistant Prosecutor, argued the cause for respondent State of New Jersey (Theodore N. Stephens II, Acting Essex County Prosecutor, attorney; Hannah Faye Kurt, of counsel and on the brief).

PER CURIAM

J.A.W. appeals from a final adjudication of delinquency for behavior which, if committed by an adult, would constitute the crimes of first-degree

felony murder, two counts each of first-degree robbery, second-degree possession of a weapon for an unlawful purpose, second-degree unlawful possession of a weapon, and one count of second-degree conspiracy to commit robbery. J.A.W., who was almost sixteen years old when he was adjudicated delinquent on October 26, 2018, received an aggregate sentence of eleven years detention.

On appeal, he argues the following points:

POINT I

BY ADOPTING THE STATE'S UNFOUNDED THEORY THAT THE SUBSEQUENTLY OBTAINED SEARCH WARRANT SHIFTED THE BURDEN OF PROOF TO J.A.W., A NOTION ROUNDLY REJECTED BY OUR SUPREME COURT IN STATE V. ATWOOD, 2[32] N.J. 433 (2018), THE MOTION COURT ERRED IN DENYING HIS SUPPRESSION MOTION CHALLENGING THE OFFICERS' INITIAL WARRANTLESS ENTRY INTO THE APARTMENT.

A. ON A MOTION TO SUPPRESS CHALLENGING WARRANTLESS POLICE ENTRY INTO A RESIDENCE, THE STATE HAS THE BURDEN TO PROVE THAT AN EXCEPTION TO THE WARRANT REQUIREMENT APPLIES.

B. THE MOTION COURT'S MISAPPLICATION OF THE BURDEN OF PROOF LED TO ITS ERRONEOUS CONCLUSIONS THAT THE APARTMENT WAS [J.N.'S] RESIDENCE AND THAT THE EXIGENT CIRCUMSTANCES

2

EXCEPTION TO THE WARRANT REQUIREMENT APPLIED – REQUIRING REVERSAL OF ITS SUPPRESSION DENIAL AND J.A.W.'S ADJUDICATIONS.

C. THE STATE'S FAILURE TO MEET ITS BURDEN REQUIRES SUPPRESSION OF THE GUN.

POINT II

THE MOTION COURT, ERRONEOUSLY CONCLUDING THAT THE EVIDENCE SUPPORTING THE TWO COMPLAINTS WOULD EACH BE ADMISSIBLE AS EVIDENCE IN A TRIAL AS TO THE OTHER TO SHOW A COMMON PLAN, FAILED TO APPLY THE COFIELD STANDARD,[1] AND IMPROPERLY SHIFTED THE BURDEN OF PROOF TO J.A.W., RESULTING IN AN IMPROPER JOINDER OF THESE OFFENSES, AND THE TRIAL COURT'S IMPROPER USE OF THE OTHER-CRIMES EVIDENCE TO ESTABLISH IDENTITY.

A. THE MOTION COURT'S ERRONEOUS N.J.R.E. 404(b)/COFIELD ANALYSIS.

B. THE TRIAL COURT'S MISUSE OF THE OTHER-CRIMES EVIDENCE TO IDENTIFY J.A.W. AS THE SHOOTER IN THE NOVEMBER 30TH HOMICIDE.

POINT III

THE TRIAL COURT ERRED IN GRANTING THE STATE'S MOTION TO WAIVE J.A.W. TO ADULT CRIMINAL COURT IN A SEPARATE AND

---

[1] State v. Cofield, 127 N.J. 328, 338 (1992).

UNRELATED MATTER WHILE DELIBERATING THE VERDICT IN THESE CASES.

POINT IV

THE SENTENCING COURT ERRED IN IMPOSING CONSECUTIVE SENTENCES ON THE ROBBERY AND FELONY-MURDER ADJUDICATIONS BASED ON THE NOTION THAT THE OFFENSES HAD INDEPENDENT OBJECTIVES, WHEN JOINDER OF THESE MATTERS WAS APPROVED TO ALLOW THE STATE TO PROVE THE OFFENSES WERE A PART OF A SINGLE, LARGER PLAN.

We are persuaded by the juvenile's argument that the trial court should have conducted an evidentiary hearing on J.A.W.'s suppression motion. For that reason, we remand the matter for a suppression hearing and direct the trial court to vacate the adjudication and hold a new trial if J.A.W. is successful at the hearing. If not, the adjudication shall remain undisturbed because we conclude J.A.W.'s remaining arguments are without merit for the reasons we express in this opinion.

I.

The First Cab Ride

We summarize the facts leading to J.A.W.'s adjudication as developed at his trial. On November 29, 2016, shortly before 11:00 p.m., taxi driver Ronald Nicolas received a call for a pickup at 236 Snyder Street in Orange. He

4

responded to the call and actually picked up, as he described, "two little boys," "one tall, one short," at nearby 157 North Day Street in Orange. At the time, Nicolas's young son was travelling with him in the front passenger seat.

Nicolas recognized one of the two boys he picked up as his friend's son J.N., whom he had known since he was a baby, and whom he had picked up in the past. On prior occasions, J.N. tried paying Nicolas with counterfeit bills.

Nicolas also recognized the shorter of the two boys because, three weeks prior, Nicolas picked him up at 400 Highland Terrace in Orange, and the boy attempted to give him a counterfeit twenty-dollar bill to pay for his ride. The calls for both pick-ups came from the same phone number.

Upon entering the cab, J.N. handed Nicolas a fifty-dollar bill that Nicolas questioned as being counterfeit and warned the boys that his car was equipped with a camera and that he would forward their picture to the police if it was counterfeit. In response, the boys asked to be let out of the car.

Nicolas stopped the car, and J.N., who was seated in the rear passenger seat, asked Nicolas to return the fifty-dollar bill and then placed a silver revolver with a brown handle against Nicolas's head and told him not to move. Nicolas's son said, "chill, chill, why you do that?" J.N. then pressed the gun against the son's head and said, "shut up your mouth before I blow your head."

A-1686-18

The shorter boy, who was seated directly behind Nicolas, demanded to know "where's the money at," and Nicolas told him it was by the door. The shorter boy took back the counterfeit fifty-dollar bill and twelve or thirteen dollars belonging to Nicolas and said to J.N., "Josh, let's go." The pair ran back towards Snyder Street, dropping one of the dollar bills in the process. After this incident, Nicolas's son blocked the phone number that the pick-up calls came in from on Nicolas's phone.

### The Second Cab Ride

The next night, Nicolas was again working. At around 11:00 p.m., he received three calls, one of which again requested a pick-up at 236 Snyder Street. The telephone number associated with this call was different than the one used the night before. Nicolas did not recognize the number or the caller's voice and referred the pick-up request to another taxi company, Claudia Taxi, because he was already backed up with other calls.

Thereafter, while driving in the area, Nicolas spotted a black Lincoln Town Car with "C" written on its side turning right onto Snyder Street. Nicolas called dispatch and said, "tell them if he sees two little boy[s], one tall and one short, don't even stop." Nicolas was placed on hold.

6

Nicolas pulled over and watched as the Claudia Taxi driver stopped and two "little boys" entered the car. According to Nicolas, "the little one is – go to the – to left side by the driver. And the tall one went in the back, go to the passenger's side." It was too dark for Nicolas to see the boys' faces. As the taxi sped off, Nicolas realized the boys were "hurt[ing]" and attempting to rob the driver, so, as dispatch came back on the line with Nicolas, he asked them to call the police. The Lincoln Town Car then struck another car and a tree. After the car stopped, the two boys got out and ran away.

Detective Christopher DiRocco of the Essex County Prosecutor's Office (ECPO) responded to the scene and found the heavily damaged Lincoln Town Car with a deceased male, later identified as fifty-five-year-old Jonas LaRose, in the driver's seat with gunshot wounds to his head. DiRocco took pictures of the scene and located a projectile embedded in the driver's side front dashboard. Autopsy results subsequently confirmed LaRose died from two fatal penetrating gunshot wounds, one to the left side of his face that left three bullet fragments inside his head and one that penetrated the right side of his skull and exited out the other side.

During the ensuing police investigation, officers spoke with several witnesses. Also, they obtained surveillance video from nearby cameras.

A-1686-18

After visiting the scene, ECPO Lead Investigator Kenneth Poggi returned to the station where he spoke with Nicolas. Nicolas described one of the boys from the November 29 robbery as seventeen or eighteen years old, tall, Haitian, black and named "Josh" or "Joshua." He said the second boy was shorter, had a lighter complexion, and was approximately fourteen years old. Subsequently, after looking at a photo array, Nicolas selected a photo of J.N. as the boy who gave him the counterfeit fifty-dollar bill on November 29 and pulled a gun on him and his son.

Poggi searched a police database for "Josh" and found sixteen-year-old J.N., who had recently been charged in Berkeley Heights with burglary. There was also an open warrant for J.N.'s arrest.

Poggi reached out to the Berkeley Heights Police Department (BHPD) and, after reviewing reports regarding the burglary, noted that another individual arrested in connection with that crime was a juvenile who called himself Z.W. Both J.N. and Z.W. had provided police with a home address of 400 Highland Terrace in Orange.

<u>The Police Investigation at 400 Highland Terrace</u>

On December 2, 2016, Poggi and Detectives Carlos Olmo and Hervey Cherilien proceeded to 400 Highland Terrace to determine whether J.N. or Z.W.

resided there. According to their reports, they met with building superintendent Rick Williams in a vacant first floor apartment and showed him pictures of J.N. and Z.W. According to the officers, Williams told police he saw these boys coming in and out of the building.

After returning to the lobby, Poggi believed he saw J.N. and three or four other individuals enter the building. Olmo and Cherilien also saw kids running into the building and down a hallway. Poggi called out "Josh" but J.N. did not stop. The officers followed these individuals to Apartment 1B, the apartment it appeared the kids entered, and knocked on the door but no one answered.

Later, after obtaining a key from Williams, the detectives entered the apartment which was leased by Estilia Elysee as a home for her and her son Gary, who was paralyzed. In a bedroom behind a closed door, they found Gary and J.N., who gave officers a fake name, as well as the other individuals they saw in the lobby and who were initially identified as Z.W., who called himself J.A., Wayne Grant, Albert Nyewah and Jaylan Dawkins. J.N. and Z.W. were the only juveniles.

While in Apartment 1B, the police observed several cell phones in the bedroom and a fan running with what appeared to be counterfeit money laid out in front of it. Poggi called his superior Lieutenant Thomas Kelly for assistance

A-1686-18

and other officers, including Detective Wilfredo Perez, drove to the scene. Police placed J.N. under arrest, pursuant to the open warrant, and transported him and all the others to the ECPO for questioning, except Gary who remained in the apartment.

Poggi advised Kelly they should apply for a search warrant based on the counterfeit money and cell phones in Apartment 1B. Cherilien and Perez remained at the apartment pending receipt of the warrant. Kelly appeared before a judge to request the warrant, relying upon an affidavit prepared by a prosecutor utilizing information provided by Poggi and Kelly.

At approximately 4:00 p.m., after receiving the warrant, Cherilien and Perez began their search of Apartment 1B. They discovered four cell phones and one counterfeit fifty-dollar bill in the bedroom, and two counterfeit fifty-dollar bills and twelve or thirteen one-dollar bills in the kitchen.

<u>Statements from Occupants of 400 Highland Ave</u>

Back at the station, Poggi took a statement from J.N., who was subsequently charged with the November 29 armed robbery of Nicolas.[2] After Z.W. revealed that his real name was J.A.W., and not Z.W. or J.A., police discovered that there was an outstanding warrant for his arrest. They arrested

---

[2] Police learned that J.N.'s father lived at 649 Scotland Road, in Orange.

him and seized his clothes, cell phone, and what appeared to be counterfeit bills, two $50's and two $20's.[3]  They also photographed both J.N. and J.A.W., who was wearing an orange sweatshirt.[4]

Police also took statements from Dawkins, Grant, and Nyewah.  Dawkins and Grant made reference to J.A.W. telling them that LaRose's death was the result of a gun firing accidently during a "tussle."  Dawkins saw a gun matching Nicholas' description sticking out of J.A.W.'s pants and Grant saw J.A.W. hiding the gun behind what he described as a video cassette recorder.

### Second Search of 400 Highland Avenue

After taking the statements, Poggi called Cherilien, who was walking back to his car after completing the search of Apartment 1B, and instructed him and Perez to go back to the apartment and look for an additional item.  The officers returned and were re-admitted by Gary, who had been alone in the apartment for five or six minutes.  After police obtained a second search warrant based upon an affidavit prepared by a prosecutor and signed by Detective John Manago, Cherilien proceeded to the bedroom and retrieved a large silver revolver with a

---

[3]  Police discovered during trial preparation that the money seized from J.A.W. had been lost.

[4]  J.N. later pled guilty to his involvement in the November 29 robbery.

brown handle from within a Playstation console stand cabinet. Notably, Perez looked inside the cabinet during the first search, but the gun was not there at that time. Police subsequently found no fingerprints on the fully-operational gun, and could not confirm that the bullet fragments found in connection with the LaRose homicide came from this gun.

J.A.W.'s Charges

Police charged J.A.W. with the LaRose homicide that same night. Nicolas returned to the station three days later, and, after looking at a photo array, identified J.A.W. as the shorter boy who stole the counterfeit fifty-dollar bill and the twelve singles from him on November 29. Nicolas also identified a generic photo of a silver revolver as the type of gun used by J.N. and J.A.W. that night.

On December 3, 2016, J.A.W. was charged in a Juvenile Complaint (Docket No. FJ-07-920-17) with offenses arising from the November 30 killing of LaRose, which, if committed by an adult, would constitute: (1) first-degree murder, contrary to N.J.S.A. 2C:11-3(a) (charge one); (2) third-degree forgery, contrary to N.J.S.A. 2C:21-1(a) (charge two); (3) first-degree robbery, contrary to N.J.S.A. 2C:15-1(a)(1) (charge three); (4) second-degree unlawful possession of a handgun, contrary to N.J.S.A. 2C:39-5(b) (charge four); (5) second-degree

possession of a weapon for an unlawful purpose, contrary to N.J.S.A. 2C:39-4(a) (charge five); and (6) first-degree felony murder, contrary to N.J.S.A. 2C:11-3(a)(3) (charge six).[5]

On December 7, 2016, J.A.W. was charged in a Juvenile Complaint (Docket No. FJ-07-962-17) with offenses arising from the robbery of Nicolas which, if committed by an adult, would constitute: (1) first-degree robbery, contrary to N.J.S.A. 2C:15-1 (charge one); (2) second-degree unlawful possession of a handgun, contrary to N.J.S.A. 2C:39-5(b) (charge two); (3) second-degree conspiracy to commit robbery, contrary to N.J.S.A. 2C:5-2 (charge three); (4) second-degree possession of a weapon for an unlawful purpose, contrary to N.J.S.A. 2C:39-4(a) (charge four); and (5) third-degree endangering the welfare of a child, contrary to N.J.S.A. 2C:24-4 (charge five).

---

[5]  Also, on December 5, 2016, Poggi and Cherilien recanvassed the area of the homicide and spoke with Sheedley Pierre, who became a suspect in the LaRose homicide. On December 8, Pierre was charged with felony murder and other related offenses. Police collected Pierre's Samsung cell phone, as well as ammunition and a blue jacket with reddish stains from Pierre's apartment. DNA testing confirmed that Pierre's and LaRose's blood were on the jacket in different spots and that LaRose's blood was on the revolver. J.A.W.'s blood was not found on anything.

A-1686-18

On October 17, 2017, the court granted the State's motion to consolidate the two complaints only for trial purposes.[6] On January 11, 2018, the trial court denied J.A.W.'s motion to suppress evidence, without an evidentiary hearing.

The trial court held a bench trial on various dates between March and June 2018. During the court's deliberations, it granted the State's motion waiving J.A.W. to adult criminal court in an unrelated matter.

The trial court rendered its verdict on August 30, 2018. The court set forth its findings of facts and conclusions of law addressing the two complaints separately in two comprehensive written decisions, one dated July 19, 2018, and the other, August 31, 2018. As to Docket No. FJ-07-920-17, the trial court found J.A.W. guilty of charges three through six, but acquitted him as to charges one and two. As to Docket No. FJ-07-962-17, the trial court found J.A.W. guilty of charges one through four, but acquitted him as to charge five.

At an October 26, 2018 disposition hearing, the trial court merged charges three and five into charge six under Docket No. FJ-07-920-17, and charge three and four into charge one under Docket No. FJ-07-962-17, and sentenced J.A.W. to: (1) an indeterminate custodial sentence of nine years at the Training School

---

[6] The judge who decided the consolidation motion was different than the one who decided the suppression motion and presided over the bench trial.

for Boys on charge six (felony murder) of Docket No. FJ-07-920-17; (2) a concurrent two-year term on charge four (unlawful possession of a weapon) of Docket No. FJ-07-920-17; (3) a consecutive two-year term on charge one (first-degree robbery) of Docket No. FJ-07-962-17; and (4) a concurrent two-year term on charge two (unlawful possession of a weapon) of Docket No. FJ-07-962-17. J.A.W.'s sentence was thus eleven years. This appeal followed.

## II.

We begin our review by addressing J.A.W.'s appeal from the denial of his motion to suppress. On appeal, J.A.W. contends the trial court erred in denying his suppression motion, which was premised upon the alleged unlawfulness of the detectives' execution of J.N.'s arrest warrant inside the Elysees' apartment without a search warrant. J.A.W. argues that by focusing on the subsequently obtained search warrants, the trial court improperly shifted the burden of proof to him on the issue of whether the police reasonably entered Apartment 1B in the first instance without a warrant. He also contends the trial court erred in failing to hold a hearing to resolve material issues of fact as to the lawfulness of the detectives' initial entry into Apartment 1B. As already noted, we agree that a hearing should have been conducted by the trial court before deciding the suppression motion.

## A.

Prior to trial, J.A.W. moved to suppress the evidence recovered from Apartment 1B. In his brief, which was not accompanied by any supporting affidavits, he argued that the December 2, 2016 search warrants were the fruit of a poisonous tree because police unlawfully entered apartment 1B, the home of a third-party, to execute the warrant for J.N.'s arrest. According to J.A.W: (1) it was unreasonable for the police to have concluded that J.N. resided in Apartment 1B; and (2) the State failed to prove the existence of exigent circumstances, especially considering Williams contradicted the State's assertion that J.N. entered the lobby and entered Apartment 1B while the police were present.

In a responding brief, to which it attached the search warrants and supporting affidavits setting forth the detectives' version of events leading up to their entry into Apartment 1B, the State insisted that: (1) the search warrants were not the fruit of a poisonous tree because the detectives reasonably believed J.N. lived in Apartment 1B and spotted J.N. in the lobby heading to that apartment; and (2) even if J.N. was not a resident of Apartment 1B, the detectives were justified in entering that apartment due to exigent circumstances upon spotting J.N. in the lobby.

16

The trial court determined that because there were search warrants that were presumed to be valid, J.A.W. had to do more than make bald assertions in support of his position. At the very least, J.A.W. should have obtained a sworn statement from Williams asserting that the detectives were lying, in order to support J.A.W.'s position that there was a material issue of fact as to whether J.N. was seen in the lobby. The court directed J.A.W.'s counsel to supplement his filings.

Thereafter, J.A.W.'s counsel submitted a reply brief reiterating his arguments and maintaining that an evidentiary hearing was needed because of material issues of fact. Counsel provided the court with certifications from Williams, Elysee, and Sunny Liberoi of 400 Realty Management, the company that managed 400 Highland Ave, as well as a copy of the lease for Apartment 1B.

In his certification, Williams stated that: (1) he spoke to the police in his office; (2) this conversation was not interrupted by anyone running through the lobby; (3) no one entered the building as he escorted the officers out; (4) the officers did not shout at anyone to stop and there was no subsequent chase; and (5) the officers departed without following anyone to Apartment 1B and then returned ninety minutes later with a warrant, at which time he gave them the

keys to Apartment 1B. Gary certified that he resided in Apartment 1B and that J.N. and the others were his invited guests on December 2, 2016. Liberoi certified that Apartment 1B was leased by Gary's mother, Estilia.

In its January 11, 2018 written decision denying J.A.W.'s motion to suppress, the trial court first acknowledged the applicability of the two-prong test stated in State v. Miller, 342 N.J. Super. 474, 500 (App. Div. 2001), for determining whether an arrest warrant was properly executed inside a dwelling. The court was satisfied that, as set forth in the police affidavits, after discovering two viable possible addresses for J.N. in police records, Poggi had reasonably gone to 400 Highland Terrace to confirm J.N.'s residency, and possibly execute the active bench warrant for J.N.'s arrest in a separate matter. The court emphasized that the detectives were acting in furtherance of the investigation into both the Nicolas robbery, for which J.N. was a named suspect, and the LaRose homicide, for which he was a person of interest.

Moreover, the trial court was satisfied, based upon the representations in the officers' affidavits, that: (1) Williams confirmed that J.N. had been staying at 400 Highland Terrace for approximately a month; (2) Poggi spotted J.N. entering the building and proceeding to Apartment 1B; and (3) the detectives were in pursuit of J.N. when they entered Apartment 1B to effectuate his arrest.

Based on these facts, the trial court concluded as follows:

> The court finds that exigent circumstances indeed existed for the detectives to follow J.N. into Unit 1B. <u>Once the detectives lawfully entered Apt. 1B and secured J.N.</u> and observed in plain view what they believed was possible contraband and what might constitute evidence in both a first[-]degree robbery and murder; the detectives secured the location and followed all appropriate procedures to secure judicially approved warrants.
>
> The [c]ourt is satisfied and finds that the items seized in the search and seizure of Unit 1B were seized pursuant to lawfully issued warrants. The [c]ourt further finds that the defense, who bears the burden of proof, has failed to prove that probable cause did not exist to support the issuance of the warrants. . . .
>
> . . . The court is satisfied that adequate probable cause existed to support the affidavits filed by . . . Kelly and . . . Man[ag]o in support of a search warrant issued for Unit 1B on December 2, 2016.
>
> [(Emphasis added).]

The court continued:

> Having reviewed all of the defense's submissions and after hearing oral argument, the court is not persuaded that the third[-]party guest argument pursuant to <u>Steagald v. United States</u>, 451 U.S. 204, 205-06 (1981), is controlling. The court finds that this was not an invalid warrantless search. The court, taking into consideration all of the facts and circumstances presented finds that the burden of proof rests on the <u>[d]efense to prove that probable cause did not exist in support of the issuance of the search warrants</u> . . . .

19

> The [c]ourt is further satisfied that the defense who bears the burden of proof has not established a willful, intentional misrepresentation of facts in the affidavits submitted which would necessitate an evidentiary hearing requiring testimony. The [c]ourt is not satisfied that [the] twenty-two one sentence paragraph[s] [in the] certification of . . . Williams, or the certifications of Gary . . . , or . . . Liberoi meet the defense's burden of proof and as such the motion to suppress evidence recovered on December 2, 2016[,] . . . is denied.

In a footnote, the court also stated that although J.A.W. did not seek a hearing under Franks v. Delaware, 438 U.S. 15[4] (1978), to challenge the truthfulness of factual statements made in the officers' affidavits supporting the warrants, it was evident from his "counsel's brief and his arguments . . . that defense counsel is alleging that . . . Poggi and the officers did not see J.N. and the other juveniles enter the building and that the officers 'lied'[.]" The court concluded "that there [was] no preliminary showing by the defense that a false statement was made knowingly and intentionally, and with reckless disregard for the truth by either . . . Kelly or . . . Manago in their affidavits in support of search warrants issued by [another judge] and as such, no hearing pursuant to the Frank[s'] standard is warranted, even if it were defense['s] contention."

20

B.

In our review of a denial of a suppression motion, we must uphold the trial court's findings if they are supported by "sufficient credible evidence in the record." State v. Lamb, 218 N.J. 300, 313 (2014). This deference is applicable regardless of whether there was a testimonial hearing, or whether the court based its findings solely on its review of documentary evidence. State v. S.S., 229 N.J. 360, 381 (2017). If, however, the trial court's factual findings are clearly mistaken, the interests of justice require intervention. Ibid.

Here, we conclude there was a material issue of fact as to whether the officers' initial entry into Apartment 1B was a lawful warrantless entry for purposes of arresting J.N. on the outstanding arrest warrant. A warrantless search is presumed invalid unless it falls within one of the recognized exceptions to the warrant requirement, which the State has the burden of demonstrating. State v. Williams, 461 N.J. Super. 1, 10 (App. Div. 2019). When an entry is invalid, what proceeds thereafter is tainted and the trial court must suppress any evidence seized as a result of the unlawful entry. Miller, 342 N.J. Super. at 500. A later-obtained search warrant does not retroactively validate preceding warrantless conduct by the State that is later challenged by a defendant in a suppression motion. Atwood, 232 N.J. at 448.

21

Ordinarily, absent consent or exigency, the police may not enter a third-party's residence without a search warrant for the purpose of searching for a suspect for whom they have an arrest warrant. Miller, 342 N.J. Super. at 495; accord Steagald, 451 U.S. at 205-06. Whether exigent circumstances justify dispensing with the need for a search warrant must be determined "on a case-by-case basis with the focus on police safety and preservation of evidence." State v. Craft, 425 N.J. Super. 546, 554 (App. Div. 2012) (quoting State v. Pena-Flores, 198 N.J. 6, 11 (2009)).

A court must consider the totality of the circumstances to determine whether it was "impracticable to secure a warrant" prior to the search. State v. Johnson, 193 N.J. 528, 553 (2008) (noting that exigency will be found "when inaction due to the time needed to obtain a warrant will create a substantial likelihood that the police or members of the public will be exposed to physical danger or that evidence will be destroyed or removed from the scene"). Police officers acting pursuant to a valid arrest warrant have the right to follow a fleeing suspect into a private residence. State v. Jones, 143 N.J. 4, 19 (1995).

However, even where there is no exigency, an arrest warrant still may be lawfully executed in a third-party's residence if the officers executing the warrant have "objectively reasonable bases for believing that the person named

in the warrant both resides in the dwelling and is within the dwelling at the time." Miller, 342 N.J. Super. at 495. Objective reasonableness is assessed in light of the facts known to the officers at the time. State v. Bruzzese, 94 N.J. 210, 221 (1983). This reasonableness test may be satisfied even though the police have made a mistake in executing a warrant. State v. Handy, 412 N.J. Super. 492, 499 (App. Div. 2010).

On a defendant's motion to suppress evidence seized in a warrantless search, he or she need just file a notice of motion making some showing of illegality. R. 3:5-7(b). The State, which bears the burden of proof, State v. Brown, 216 N.J. 508, 527 (2014), must then submit a brief and affidavit in support of the search, which the defendant can then counter with a brief and statement of facts, with or without an affidavit. State v. Torres, 154 N.J. Super. 169, 172-73 (App. Div. 1977). In the case of a warranted search, the burden of proof is on the defendant to demonstrate that the warrant was issued without probable cause or that the search was otherwise unreasonable and, as such, his or her notice of motion must be accompanied by a brief as well as an affidavit setting forth the facts relied on. State v. Chippero, 201 N.J. 14, 26 (2009).

Where there is a material dispute as to the facts surrounding a warrantless entry, an evidentiary must be held to resolve the conflict. Under Rule 3:5-7,

"the existence of a factual dispute may be ascertained from an examination of the factual assertions contained in the briefs of the parties." Torres, 154 N.J. Super. at 172. If material facts are disputed, testimony must be taken in open court. R. 3:5-7(c); Atwood, 232 N.J. at 445. A trial court's determination of whether disputed facts are material is a matter of law, not entitled to particular deference on review because it involves assessing the legal consequences that would flow from facts if established. See Lamb, 218 N.J. at 313.

Here, at the very least, the Williams affidavit established a question of fact as to whether the police witnessed J.N. enter Apartment 1B before entering without a search warrant. There were three searches here, one warrantless and two warranted. Because the warrantless search occurred first and allegedly justified the subsequent warranted searches, contrary to the trial court's view, the State initially bore the burden of proof as to whether the police reasonably entered the Elysees' apartment to execute the warrant for J.N.'s arrest. J.A.W.'s initial brief, alone, was sufficient to open the matter before the court. A plain reading of the parties' later submissions reveals issues of fact raised by the Williams affidavit regarding J.N.'s presence and the officers' claimed sighting of J.N. in the lobby that were material to the outcome here.

For that reason, we are constrained to remand this matter for the purpose of holding an evidentiary hearing as to the lawfulness of the officers' initial entry into Apartment 1B. If the trial court concludes after the hearing that the entry was lawful, J.A.W.'s adjudication shall remain undisturbed. If the court holds otherwise, the trial court shall vacate the adjudication, suppress the evidence secured through all three searches and hold a new trial.

## III.

Next, we address J.A.W.'s challenge to the trial court consolidating the two complaints for trial. He contends that joinder was improper because: (1) while the crimes were similar, they were not components of an integrated plan; (2) the notion that the two incidents were an integrated plan was irrelevant to any material issue in either case and could not be used to bolster witness credibility; (3) the trial court relied upon the Rule 403 standard for undue prejudice whereby exclusion is warranted only if the risk of undue prejudice "substantially" outweighs the "probative value" of the evidence, rather than the Cofield prong four standard which requires exclusion where the potential for undue prejudice simply outweighs the probative value; and (4) it improperly shifted the burden of proof as to prong four to J.A.W. N.J.R.E. 403. We

conclude that, although there were flaws in the trial court's analysis, the flaws did not result in a manifest denial of justice requiring reversal.

A.

Prior to trial, the State applied to join the two juvenile complaints for trial. For purposes of this determination, the parties agreed to the following three stipulations: (1) notwithstanding that Nicolas reported a silver handgun was used by the perpetrators on November 29 and that a silver handgun was later found at Apartment 1B, there were no ballistics indicating that the same gun was used on both November 29 and November 30; (2) the phone numbers corresponding to the relevant calls made to Nicolas on the two nights were not the same; and (3) there was no indication that the voice Nicolas heard on November 29 was the same as the voice he heard on November 30, during the relevant calls.

In response, the trial court granted the State's motion. At the outset of its decision, the court found that the charges under both indictments were similar and that the murder and felony murder charges arguably flowed from the prior evening's robbery. The court stated as follows:

> Regarding the factual allegations under each docket, both . . . allege phone calls to a taxi service . . . between 10 and 11 o'clock at night. Both . . . allege a call to the same taxi service, although the parties have

 A-1686-18

stipulated that the calls came from different phone numbers and eventually the November 30th call was transferred to another company. Both . . . have the caller requesting to be picked up from 236 Snyder Street in the City of Orange, notwithstanding the fact that the pickup location on November 29th eventually changed. Both . . . allege two passengers were picked up, . . . [J.A.W.] as well as a second individual.

Based upon the foregoing, the [c]ourt finds that the offenses the State seeks to join are of . . . similar character both in the charges against the juvenile and the factual allegations . . . underlying those charges. Therefore, the . . . State has satisfied the requirements of Rule 3:7-6.

Turning its attention to Rule 404(b), the court further ruled:

Counsel for the juvenile avers that the joinder of the [dockets] would be unduly prejudicial . . . [as it would] improperly put the allegations of the juvenile's disposition at the forefront of the fact-finder's analysis rather than the State's . . . proofs and burden of proof. [Defense counsel] also asserts that there was not a common plan, . . . because on November 29th the intent of the actors, according to the co-juvenile's guilty plea, was to use counterfeit money. However, the preparation and/or plan in both incidents was to financially victimize a taxi driver whether through deceit, using counterfeit bills, or through force, using armed robbery. Based upon the foregoing, I find that the other crimes . . . evidence would be admissible under 404(b).

Last, the trial court considered the four-prong Cofield analysis and found

that the first prong was satisfied because:

27

[E]vidence from the November 29th, 201[6] offense would be and is admissible as relevant to material issues in the November 30th offense. The victim of the November 29th robbery, . . . Nicolas, arrived in the area of 236 Snyder Street on November 30th and observed two people exit a black Lincoln Town Car, which sped off and crashed into a tree. . . .

[Nicolas] told the police, at the time, . . . that the two incidents might be related. [Nicolas] is . . . a fact witness . . . to the events on November 30th. The reason he suspected the incidents were related is because he was a victim of a robbery in the same area the day before. [Nicolas] knew J.N. prior to the robbery and identified J.N. as one of the people who robbed him on November 29th. The police investigation of J.N., [led them] to [J.A.W.], one of J.N.'s known associates.

One way to gauge a witness' credibility is to assess how and why the witness came to know what they are testifying about. Without the ability to discuss how and why [Nicolas] thought that the two incidents were related, his credibility would be undermined. This is true not only for [Nicolas's] testimony, but the testimony of the investigating officers as well. Again, when the question becomes why were you looking at [J.A.W.], the answer to that question relates to the investigation that started on the 29th. Again, the . . . investigation focused on [J.A.W.] began because of information derived directly from the investigation of the November 29th, robbery.

The trial court was also persuaded that the second prong was satisfied because, as noted above, the incidents occurred within twenty-four hours of each other and followed a similar pattern. As to the third prong, the court found that

28

the evidence of the November 29 robbery was clear and convincing, emphasizing that J.N. had already pled guilty in that case, and that Nicolas had been an active participant in both investigations. As to prong four, the court found as follows:

> Finally, prong four, the probative value of the evidence must not be outweighed by its apparent prejudice. Pursuant to Rule of Evidence 403, relevant evidence may be excluded if its probative value is substantially outweighed by the risk of . . . undue prejudice, confusion of issues or misleading the jury. The burden is on the party urging exclusion of the evidence to convince the court that the Rule 403 consideration should control. That's in Rosenblit v. Zimmerman, a State Supreme Court case, 166 N.J. 391. Under Rule 403 the question is not whether the child's testimony will be prejudicial, but whether it will be unfairly so. That's from Griffin v. City of East Orange, another State Supreme Court case at 225 N.J. 400.
>
> "Evidence claiming to be unduly prejudicial can only be excluded where its probative value is so significantly outweighed by its inherently inflammatory potential as to show a probable capacity to divert the minds of the jurors or the fact-finder from a reasonable and fair evaluation of the basic issues of the case." That's from State v. Thompson, 59 N.J. 396, a 1971 State Supreme Court case.
>
> The Court holds that the probative value of the other crimes evidence in this matter is . . . not outweighed by its apparent prejudice. The probative value of the . . . fact that the investigation of the November 29th robbery led directly to the investigation of [J.A.W.] outweighs potential prejudice. The

29

allegation that the juvenile committed an armed robbery the night before it[']s alleged he committed a murder is not so inherently inflammatory that [it] would divert that finder of fact from a reasonable and fair evaluation of the basic of the case.

B.

The decision to admit or exclude other crimes or wrongs evidence rests within the trial court's sound discretion and will only be set aside where there has been a clear error judgment resulting in a manifest denial of justice. State v. Gillispie, 208 N.J. 59, 84 (2011). Where, however, a trial court has improperly applied or failed to apply the Cofield analysis, our review is de novo. State v. Rose, 206 N.J. 141, 157-58 (2011). Even where there has been an abuse of discretion by the trial court, we must determine whether the error is harmless or requires reversal. State v. Prall, 231 N.J. 567, 583 (2018).

A trial court may order that multiple indictments or juvenile complaints be tried together if the offenses charged therein could have been joined in a single indictment or complaint. R. 3:15-1(a). Under Rule 3:7-6, two or more offenses may be charged in the same indictment or juvenile complaint if the offenses are of the same or similar character, are based on the same act or transaction or constitute parts of a common scheme or plan. In assessing the

propriety of a trial court's decision to join crimes for trial, we consider whether any error led to an unjust result.  State v. Sterling, 215 N.J. 65, 101 (2013).

Although joinder is favored, economy and efficiency interests do not override a defendant's right to a fair trial.  Id. at 72.  As such, Rule 3:7-6 also provides for relief from prejudicial joinder, referencing Rule 3:15-2(b), which vests a court with discretion to sever charges "[i]f for any other reason it appears that a defendant or the State is prejudiced by a permissible or mandatory joinder of offenses or of defendants in an indictment or accusation."

The relief afforded by Rule 3:15-2(b) addresses the inherent danger when several crimes are tried together, that the finder of fact may use the evidence cumulatively to reach a verdict it would not otherwise have reached.  Sterling, 215 N.J. at 73.  The critical inquiry for a court deciding whether to grant relief from joinder of offenses because of potential prejudice is "whether, assuming the charges were tried separately, evidence of the offenses sought to be severed would be admissible under [Rule 404(b)] in the trial of the remaining charges." Ibid. (quoting State v. Pitts, 116 N.J. 580, 601-02 (1989)).

Pursuant to Rule 404(b):

> [E]vidence of other crimes, wrongs, or acts is not admissible to prove a person's disposition in order to show that on a particular occasion the person acted in conformity with such disposition.

. . . [Such] evidence may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident when such matters are relevant to a material issue in dispute.

Our Supreme Court has clarified that such evidence may be admitted provided it meets the following test:

> 1. The evidence of the other crime must be admissible as relevant to a material issue;
>
> 2. [i]t must be similar in kind and reasonably close in time to the offense charged;
>
> 3. [t]he evidence of the other crime must be clear and convincing; and
>
> 4. [t]he probative value of the evidence must not be outweighed by its apparent prejudice.
>
> [Cofield, 127 N.J at 338 (citation omitted).]

This analysis is intended to reduce the underlying danger that the factfinder may convict a defendant because he or she is a "bad person" "in general." State v. Castagna, 400 N.J. Super. 164, 175 (App. Div. 2008) (citing State v. Reddish, 181 N.J. 553, 608 (2004)). The party seeking to admit other crime evidence bears the burden of establishing that the probative value of the evidence is not outweighed by its apparent prejudice. Reddish, 181 N.J. at 608-09.

Notably, "[t]emporality and similarity of conduct is not always applicable, and thus not required in all cases." Rose, 206 N.J. at 160. And, prong four does not require, as does Rule 403, that the prejudice substantially outweigh the probative value of the evidence before it is excluded. Id. at 161. But, other crime evidence should not be admitted merely to bolster the credibility of a witness against the defendant. Prall, 231 N.J. at 583. Moreover, the trial court must ensure that there is no less inflammatory evidence available regarding the disputed issue. State v. Darby, 174 N.J. 509, 518 (2002).

With these guiding principles in mind, we first address whether there was a plan or overriding scheme here and conclude the trial court correctly determined the repeated attempts to pass counterfeit bills by J.A.W. and J.N., per Nicolas in the same section of Orange during a short period of time, and the discovery of counterfeit bills at Apartment 1B, where both juveniles had been staying, indicated an orchestrated plan to defraud taxi drivers and perhaps others. The investigation that followed the November 29 robbery revealed this plan and enabled police to identify the suspects in the homicide.

Also, given that J.A.W. disputed that he was present the night of November 30, identity was a material issue in the LaRose homicide. Although the trial court improperly brought up the issue of witness credibility in its prong

one analysis, we read its finding to mean that the circumstances of the November 29 robbery were necessary to the State being able to demonstrate the validity and strength of the investigation which resulted in the identification of J.A.W.

However, as to prong four of the Cofield analysis, we agree with defendant that the trial court improperly referenced Rule 403 as to both the need for "significant" prejudice to overcome probative value and the matter of who bore the burden of proof. However, since the court also mentioned the proper prong four weighing analysis, and the probative value of the November 29 robbery was so great, we conclude that reversal is not warranted on this basis.

Moreover, because the court and not a jury was the factfinder here, and the circumstances of the November 29 robbery helped convince the court that there was no intentional murder, which supported J.A.W.'s acquittal on the most serious charge, we reject J.A.W.'s contention that the trial court erred in granting the State's joinder motion.

IV.

We turn our attention to J.A.W.'s contention about the trial court erring by granting the State's motion to waive J.A.W. to adult criminal court in an unrelated matter while deliberating on the verdict in this case. We find no merit to his argument.

At the June 26, 2018 post-trial probable cause hearing on the State's motion to waive J.A.W. to adult court in an unrelated matter, counsel for J.A.W. objected to the trial court hearing the motion because it was still deliberating on its decision in the present robbery and homicide cases. Counsel expressed particular concern about the court watching the video in the unrelated matter that arose from a violent altercation involving J.A.W., which took place at the Essex County Detention Center on November 27, 2017. In this video, J.A.W. is seen approaching another boy and striking him in the head with a closed fist. Two other boys join J.A.W. and the three force the victim to the ground and continue kicking and stomping on his body and head until staff break up the fight. The victim, who did not fight back, allegedly suffered a broken jaw, a concussion, and a loss of consciousness.

The trial court responded to counsel's concerns as follows:

> Yeah, the [c]ourt notes counsel's objection and does understand the reasons for the argument that this matter should wait until the [c]ourt has made a final decision as to the young man's guilt or innocence with respect to the other two dockets. It is this [c]ourt's belief that it certainly has the power to not allow taint to go from one proceeding to the other. It is part of the necessity of this process where there is no jury empaneled, that the [c]ourt has to be the trier of fact. The [c]ourt often considers other issues, facts and circumstances as it is the trier of fact with respect to one matter, but potentially able to accept a plea in

35

> another matter, handle other matters that come before the [c]ourt as they relate to the juvenile.
>
> This [c]ourt has certainly been aware that this proceeding, which the State filed in about January 24th of 2018 has been pending for a significant period of time. It was pending at the time that the [c]ourt began to take testimony in the other two matters. One matter will not affect the [c]ourt's ability to make an independent decision on the separate matter. And the [c]ourt will proceed today over [d]efense's objections for these reasons.

At the conclusion of the hearing, the trial court granted the State's motion.

On appeal, J.A.W. contends that the trial court's exposure to proof of an unrelated violent act committed by J.A.W. while deliberating its decisions in this case violated Rule 404(b) and deprived him of a fair trial. In J.A.W.'s view, the notion that judges, as factfinders, can compartmentalize inadmissible prejudicial information far better than jurors "has its limits," and what occurred here "effectively amounted to the admission of other-crimes evidence in this matter." J.A.W. notes that the trial court elected not to hear the State's joinder motion in this case so as to avoid any interference with its ability to try the case in an unbiased manner.[7]

---

[7] A different judge decided that motion.

A-1686-18

We conclude that J.A.W.'s contentions are without sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(2). Suffice it to say, "[t]rained judges have the ability 'to exclude from their consideration irrelevant or improper evidence and materials which have come to their attention.'" State v. Medina, 349 N.J. Super. 108, 130 (App. Div. 2002) (quoting State v. Kunz, 55 N.J. 128, 145 (1969)). Here, J.A.W. offers nothing but speculation in support of his contention that, in adjudicating these matters, the trial court was improperly swayed by the evidence presented at the waiver hearing.

Also, and significantly, there is nothing in the record to support a contention that the trial court was biased against J.A.W. in this case because of the waiver motion in the later matter. In its decision regarding the LaRose homicide, the trial court gave extensive reasons for its conclusion that J.A.W. was involved in that crime. Moreover, again, it cannot be ignored that the trial court acquitted J.A.W. of first-degree purposeful murder, finding that the State had not proven that J.A.W. intended to commit murder or cause serious bodily injury to LaRose. In so doing, it accepted the testimony of both Dawkins and Grant that J.A.W. claimed the shooting was an accident. We have no reason to disturb J.A.W.'s adjudication because of the waiver.

A-1686-18

## V.

Last, J.A.W. contends the trial court abused its discretion in imposing consecutive sentences. He argues the trial court erred by finding the crimes were predominantly independent of each other, when it previously found the cases should be joined for trial because they were part of a single plan. We disagree.

## A.

At J.A.W.'s disposition hearing, the trial court deemed applicable the following five aggravating factors: (1) "[t]he character and attitude of the juvenile indicate that the juvenile is likely to commit another delinquent or criminal act," N.J.S.A. 2A:4A-44(a)(1)(c); (2) "[t]he need for deterring the juvenile and others from violating the law," N.J.S.A. 2A:4A-44(a)(1)(g); (3) "[t]he impact of the offense on the victim or victims," N.J.S.A. 2A:4A-44(a)(1)(j); (4) "[t]he impact of the offense on the community," N.J.S.A. 2A:4A-44(a)(1)(k); and (5) "[t]he threat to the safety of the public or any individual posed by the child," N.J.S.A. 2A:4A-44(a)(1)(l).

The trial court also found four mitigating factors: (1) "[t]he juvenile has no history of prior delinquency or criminal activity or has led a law-abiding life for a substantial period of time before the commission of the present act,"

A-1686-18

N.J.S.A. 2A:4A-44(a)(2)(h); (2) "[t]he separation of the juvenile from the juvenile's family by incarceration of the juvenile would entail excessive hardship to the juvenile or the juvenile's family," N.J.S.A. 2A:4A-44(a)(2)(l); (3) "[t]he willingness of the juvenile to cooperate with law enforcement authorities," N.J.S.A. 2A:4A-44(a)(2)(m); and (4) "[t]he conduct of the juvenile was substantially influenced by another person more mature than the juvenile," N.J.S.A. 2A:4A-44(a)(2)(n). The court was satisfied that, on both a qualitative and quantitative basis, the aggravating factors outweighed the mitigating factors.

As already noted, the trial court merged various counts and sentenced J.A.W. to an indeterminate custodial sentence of nine years under one complaint and a consecutive two-year term under the other. The court explained its decision to impose consecutive sentences as follow:

> Now, as to the [c]ourt's findings that a consecutive sentence was appropriate with respect to the first-degree robbery, the [c]ourt has considered the factors outlined in State v. Yarbough, 100 N.J. 627, 6[43]-44 (1985), and State v. Miller, 10[8] N.J. 112 (1987). And the [c]ourt has considered that: One, there could be no free crimes in the system for which the punishment is designed to fit the crime. Two, the reasons for imposing the consecutive sentence are as follows: The crimes involved separate acts of violence, separate threats of violence committed upon separate persons. The crimes were committed at different times

39

and in separate places. They are linked closely in time, the [c]ourt recognizes, and it is arguable that they are a single period of that apparent behavior. But even if the [c]ourt found that to be, the [c]ourt is required to balance these <u>Yarbough</u> factors in a qualitative manner as opposed to a quantitative manner. The [c]ourt does find that the crimes involved separate, distinct and multiple victims.

The [c]ourt has considered the convictions for which the sentences are to be imposed as numerous. There should be, and the [c]ourt has considered, and there should be no double counting of the aggravating factors. The [c]ourt does not believe it has done that. The [c]ourt has set an overall out[er] limit on accumulation of consecutive sentences having imposed only one consecutive sentence for the robbery. The [c]ourt does impose that consecutive sentence because it finds that the crime[s] and their objectives . . . [were] predominantly independent of each other, though the victims were similarly situated and the motive – the intended result may have been the same.

B.

In reviewing a juvenile disposition, we must determine whether the findings of fact regarding aggravating and mitigating factors were based on competent and reasonably credible evidence in the record, whether the court applied the correct sentencing guidelines enunciated in the New Jersey Criminal Code, and whether the application of the factors to the law constituted such clear error of judgment as to shock the judicial conscience. <u>State ex rel. K.O.</u>, 424 N.J. Super. 555, 564-55 (App. Div. 2012); <u>State v. Fuentes</u>, 217 N.J. 57, 70

(2014). In performing our review, we will not substitute our judgment for the judgment of the trial court. State v. Cassady, 198 N.J. 165, 180 (2009).

N.J.S.A. 2C:44-5(a) provides in general terms for consecutive and concurrent sentences of imprisonment for offenders convicted of more than one offense. In Yarbough, the Court provided additional guidance for the exercise of sentencing discretion in imposing consecutive terms. See 100 N.J. at 643-44.

The Yarbough Court prefaced its guidelines by emphasizing that sentencing courts "should be guided by the Code's paramount sentencing goals that punishment fit the crime, not the criminal, and that there be a predictable degree of uniformity in sentencing." Id. at 630. The consecutive sentencing guidelines to be applied when "an offender . . . has engaged in a pattern of behavior constituting a series of separate offenses or committed multiple offenses in separate, unrelated episodes" are:

> (1) there can be no free crimes in a system for which the punishment shall fit the crime;
>
> (2) the reasons for imposing either a consecutive or concurrent sentence should be separately stated in the sentencing decision;
>
> (3) some reasons to be considered by the sentencing court should include facts relating to the crimes, including whether or not:

(a) the crimes and their objectives were predominantly independent of each other;

(b) the crimes involved separate acts of violence or threats of violence;

(c) the crimes were committed at different times or separate places, rather than being committed so closely in time and place as to indicate a single period of aberrant behavior;

(d) any of the crimes involved multiple victims;

(e) the convictions for which the sentences are to be imposed are numerous;

(4) there should be no double counting of aggravating factors;

(5) successive terms for the same offense should not ordinarily be equal to the punishment for the first offense . . .

[Id. at 643-44 (footnote omitted).]

Sentencing courts are required to identify and weigh the appropriate mitigating and aggravating factors in determining whether sentences should run concurrently or consecutively in order to facilitate appellate review. Miller, 108 N.J. at 122. Significantly, "[t]he 'no free crimes' guideline does not require the court automatically to impose consecutive sentences for multiple offenses." State v. Rogers, 124 N.J. 113, 121 (1991). Rather, all of the Yarbough guidelines must be considered, with special emphasis placed on the five subparts

42

to the third guideline.  Ibid.  These subparts should be applied qualitatively, and consecutive sentences may be imposed even though a majority of the subparts support concurrent sentences.  State v. Carey, 168 N.J. 413, 427-28 (2001).

Here, the trial court found that there were numerous convictions involving separate acts of violence and threats of violence against three different people on two different days, all legitimate bases for consecutive sentencing. Moreover, the court noted that, even if it viewed the offenses as part of one period of aberrant behavior, a qualitative analysis still supported consecutive sentences.

We conclude the trial court performed the required Yarbough analysis and did not seek only to impose the longest sentence possible.  Moreover, contrary to J.A.W.'s assertion, the analysis for joinder that is premised upon evidentiary issues and efficiency, is entirely different than the analysis for consecutive sentencing that is based upon the notion that there should be no free crimes and the other Yarbough factors.  The trial court sentenced J.A.W. in accordance with sentencing guidelines, and there is nothing about the sentence that shocks our judicial conscience.

Affirmed in part, remanded in part for further proceedings consistent with our opinion. Pending the outcome of the remand, J.A.W.'s adjudication and sentence shall remain in force. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-1686-18